WOODSON H. MORRIS v. TERRITORY.

No. 116, Okla. T.   Opinion Filed January 29, 1909.

(99 Pac. 760.)

1.   EVIDENCE—Discretion of Court—Admission of Photographs.   (a) As to whether a photograph of a place or premises, on which it is charged that an offense was committed, is admissible in evidence, in any particular situation of a trial, is within the discretion of the trial judge; and his determination will not be disturbed if there was any reasonable ground therefor.

(b) When the photographer who made the photographs of the premises where the homicide took place testified that they did not correctly show the distances and the relation of the objects which they purported to represent, it was not error for the trial court to refuse to allow them to be introduced in evidence.

(c) Photographs of persons, when proven to be correct, and when relevant to some issue in a case, are admissible in evidence.

2.   EVIDENCE—Homicide—Witnesses—Threats by Third Persons—General Questions—Exceptions—Communication of Threats.   (a) Threats

made by a third person against a defendant are not admissible until some evidence has been introduced which would give the defendant reasonable ground to believe that such third person was acting with the deceased in a common design to injure or kill the defendant.

(b) "Have you heard any of the Cassidays make any demonstrations or statements against the life of the defendant?" held to be an improper question, as being too general.

(c) When a defendant seeks to introduce threats made by a third person against him, the question as to such threats must indicate what particular person is being inquired about, so that the court can determine its relevancy to the issues in the case.

(d) An exception must be saved to alleged errors of the trial judge in the admission or exclusion of evidence, or they will not be reviewed upon appeal.

(e) When threats have been communicated to a defendant, evidence of this fact is admissible, when relevant, without requiring proof that such threats were actually made by the deceased.

(f) For a discussion of the philosophy of the law relating to evidence of threats, see opinion.

3.     FORMER JEOPARDY—Plea—Sufficiency—Identity of Offenses. (a) If a plea of former acquittal or former jeopardy shows upon its face a different offense from that for which the defendant is then on trial, or if it is otherwise fatally defective, it should not be submitted to the jury, but should be stricken from the record of the court.

(b) If, in the same affray, a person shoots and kills one person, and by a second shot kills another person, he may be separately prosecuted for killing each of them, and may be properly acquitted in one case and convicted in the other.

4.     INSTRUCTIONS—Construction as a Whole—Homicide—Premeditation —Anger or Intoxication. (a) Instructions to juries must be considered as a whole, and when so considered, if it appears that the law applicable to each issue in the case has been correctly given and the instructions are not contradictory or misleading, they are sufficient.

(b) If from any cause. at the time of the homicide, the mind of the defendant was in such a condition as to be incapable of forming a premeditated design to effect the death of the person slain, or of any other human being, he cannot be guilty of murder, unless it be proven that this state of mind, at the time of the killing, grew out of his intentional and wrongful conduct, of such character as to show that the killing was the result of previous premeditation and formed design.

(c) The mere fact that a defendant may be angry or in a condition of voluntary intoxication will not prevent an unlawful killing from being murder, provided that the defendant was in such a condition as to be able to form a design to effect the death of the party slain or any other human being.

5. **HOMICIDE—Instructions—"Passion," "Anger"—Separation of Offenses.** (a) The use of the word "passion" or "excitement" in defining murder, in addition to the word "anger," used in the statute, does not render the instructions more burdensome to the defendant or take from him any substantial right.

(b) When, in the same affray, a defendant by separate shots kills two persons, and has been indicted, tried, and acquitted for the murder of the person killed by the first shot, and is upon trial for the murder of the second person so killed, the court should instruct the jury that the prosecution is bound by the issues necessarily determined in the first trial, and that said judgment of acquittal is conclusive, and the issues therein determined cannot be tried again; and that the jury must hold the defendant justifiable in killing such first person. and that no presumption of guilt could be entertained against the defendant, upon his trial for murder of the second person killed, on account of such first killing.

6. **INSTRUCTIONS—Paragraphing.** When a defendant is on trial on the charge of murder, it is not necessary for the trial court to state the law upon any given issue applicable to the evidence of the defense in a separate paragraph from the law applicable to the evidence of the prosecution upon the same issue. When it can be done, the court may state in one paragraph the law applicable to the evidence on both sides of an issue.

7. **INSTRUCTIONS—Good Character—Requested Instructions.** (a) The better and safe practice is for trial courts, when evidence of the good character of the defendant is proper and has been introduced, to instruct the jury upon this issue.

(b) In instructing on character the court should exercise care not to trench upon the province of the jury. All that is necessary for the court to do is to inform the jury that they may give to evidence of character such weight as they may deem proper in connection with all the other testimony in the case, and the doctrine of reasonable doubt.

(c) Opinion of Supreme Court of United States in White v. U. S., 164 U. S. 100, 17 Sup. Ct. 39, 41 L. Ed. 365, with reference to instructions on character, approved and commended to the judges of Oklahoma.

(d) When a defendant requests an instruction, applicable to any issue in a case, and the trial judge should be of the opinion that the law is not correctly stated in such requested instruction, it is the duty of the trial judge to modify such requested instruction, or to give an instruction containing a correct statemetn of the law.

8. **STATUTES—Construction of Penal Statutes — Review — Harmless Error.** (a) By statute the common-law rule of strict construction of penal laws has been repealed, and this court is required to construe all laws liberally and in furtherance of justice; and we are expressly

forbidden to render judgment upon any technicality or exception which does not affect a substantial right of a defendant.

(b)  For statement of testimony, in view of which the trial judge did not commit reversible error in failing to instruct the jury upon the question of character, see opinion.

## ON MOTION FOR REHEARING.

**Former Decision Distinguished.**—Case of W P. Price v. Territory of Oklahoma, ante, p. 358, 98 Pac. 447, distinguished from case at bar.

(Syllabus by the Court.)

*Appeal from District Court, Kay County; John H. Burford, Judge.*

Woodson H. Morris was convicted of murder, and he appealed to the Supreme Court of Oklahoma Territory, whence the cause was transferred under the enabling act (Act June 16, 1906, c. 3335, 34 Stat. 267) and the Constitution of Oklahoma to the Supreme Court of the state, whence it was transferred to the Criminal Court of Appeals.  Affirmed.

At the March, 1906, term of the district court of Kay county, an indictment was returned by the grand jury against Woodson H. Morris (hereafter called defendant), charging him with the murder of Finis Cassiday, alleged to have been committed on the 27th day of February, 1906.  The defendant was arraigned, and pleaded not guilty.  The defendant was found guilty of murder upon said indictment, without capital punishment, and was sentenced to imprisonment for a period of his natural life.  A motion for a new trial was filed.  This was overruled.  An exception was duly reserved.  The case was brought by appeal to the Supreme Court of Oklahoma Territory.  Upon the admission of Oklahoma into statehood, as directed by the enabling act and the Constitution of the state, the case was transferred to the Supreme Court of the state.  As directed by law, the case was transferred to the Criminal Court of Appeals upon its creation.

*Sam K. Sulivan* and *W. C. Tetirick,* for plaintiff in error:—

On admissibility of photographs:  *Dedericks v. Salt Lake City R. Co.* (Utah) 46 Pac. 656; *State v. Rogers* (Iowa) 105 N.

W. 455; *State v. Riley,* 126 Mo. 597, 29 S. W. 577; *Smith v. Territory* (Okla.) 69 Pac. 807; *People v. Crandall,* 125 Cal. 133, 57 Pac. 785; *Barker v. Town of Perry* (Iowa) 25 N. W. 100; *Waynard v. Oregon R. & Nav. Co.,* 78 Pac. 983.

On question of threats: 21 Cyc. 893, 896; *State v. Porter,* 49 Pac. 969; *State v. Clifford,* 52 S. E. 981.

On question of charge on murder: *State v. Rhodes,* 1 Houst, Cr. Cas. 476; *People v. Bush* (Cal.) 3 Pac. 593; *State v. Henderson* (Or.) 32 Pac. 1031; *Kirk v. Territory* (Okla.) 60 Pac. 797; *Wood v. State* (Miss.) 33 So. 285; *Gee v. State* (Miss.) 33 So. 19 ; *Mahaffey v. Territory,* 11 Okla. 213.

On question of former jeopardy: Wilson's Rev. & Ann. St. 1903, §§ 5434, 5435; *State v. Price* (Iowa) 103 N. W. 197; *State v. Cooper* (N. J.) 25 Am. Dec. 490; *Dill v. People* (Colo.) 36 Pac. 230.

*W. C. Reeves,* Asst. Atty. Gen., and *C. L. Pinkham,* for the territory.—

On question of former jeopardy: Abbott's Crim. Brief, p. 141; 1 Bishop's Cr. Pro., § 817; 12 Cyc. 289; *Hite v. State,* 9 Yerg. 357; *Epps v. State,* 38 Tex. Crim. Rep. 284; *Winn v. Winn,* 82 Wis. 571; *State v. Nash,* 86 N. C. 650; *Kelly v. State,* 46 Tex. Crim. 40; *State v. Robinson,* 12 Wash, 491; *Teat v. State,* 53 Miss. 439; *People v. Majors,* 65 Cal. 138; *Jones v. State,* 61 Ark. 88.

On admissibility of photographs: 22 A. & E. Enc. Law (2nd Ed.) 772; Underhill Crim. Ev., p. 63 ; *Mauch v. City of Hartford* (Wis.) 87 N. W. 816.

FURMAN, PRESIDING JUDGE. (after stating the facts as above). First. Defendant complains of the action of the trial judge in sustaining objections to the admission of three photographs of the premises where the homicide was committed. The Supreme Court of Wisconsin correctly states the rule with reference to the admission of photographs in evidence:

"Whether a photograph is proper or not in any particular situation upon the trial of a case is a matter within the sound discretion of the trial judge, and his determination cannot be disturbed if there was any reasonable ground therefor." (*Mauch v. City of Hartford,* 112 Wis. 40, 87 N. W. 816.)

"The right to introduce photographs in evidence is always dependent upon the making of preliminary proof of their accuracy." (Ency. Law, vol. 22, p. 775.)

"The photograph or picture must be relevant as well as correct. Its relevancy will depend on the relevancy of the scene or object it represents. If a photograph purports to. represent a relevant scene or object, but portrays it in a grossly inaccurate manner, so that it practically represents something else, and the scene or object would scarcely be recognized, thereby the nonreliability of the photograph, as a correct likeness, may almost be considered as producing irrelevancy. But usually the question of relevancy is distinct from that of correctness, and is for the judge exclusively." (Underhill, Criminal Evidence, p. 63.)

Photographs of persons, animals, and written instruments are generally accurate and reliable, and when proven to have been properly made, and when relevant to some issue in a case, as a rule are admissible in evidence. This question came before the Supreme Court of Oklahoma Territory in *Smith v. Territory,* 11 Okla. 669, 69 Pac. 805. In that case the trial court admitted in evidence photographs of the deceased, showing the nature and location of the wounds and the course taken by the bullet. These photographs were offered in connection with the testimony of the surgeons, and after it had been shown that the photographs had been accurately taken and were true representations of the location of the wounds. Upon this showing the court held that the photographs were competent evidence and had been properly admitted. This was the only question with reference to the introduction of photographs as evidence, submitted to the court, and to this extent only can the decision be considered as authority. The question of the admission of photographs of places or premises was not submitted to the court. The admission of photographs of premises in evidence should be governed by the same rules as govern the admission of maps, plats,

or diagrams. They must be shown to be correct before they are admissible as evidence. If a map were admitted to be misleading and inaccurate, no one will claim that it would be competent. As is shown by the testimony of the photographer in this case, these photographs of the premises were misleading as to the distances, objects, and conditions which they purported to represent. But we place our decision upon another ground also. Under our statute, the admission of photographs or maps as evidence is addressed to the discretion of the trial court, under the circumstances of each particular case.

Section 5510, Wilson's Rev. & Ann. St. Okla. 1903, is as follows:

"(5510) § 374. When in the opinion of the court, it is proper that the jury should view the place in which the offense was charged to have been committed, or in which any other material fact ocurred, it may order the jury to be conducted in a body, in the custody of proper officers, to the place, which must be shown to them by a person appointed by the court for that purpose, and the officer must be sworn to suffer no person to speak to or communicate with the jury, nor to do so themselves, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time."

From this it is seen that the right to have the jury view the place where the offense charged was alleged to have been committed is subject to the discretion of the judge. A photograph or map of such place would be only secondary evidence, because it would not be the best evidence. It would be illogical and absurd to say that secondary evidence should be admitted arbitrarily, when, according to the plain letter of the statute, the best evidence as to the matter in controversy is only admissible "when in the opinion of the court it is proper." In the case of *Reed v. Territory, ante,* p.——, 98 Pac. 583, this court discussed the right of inspection by the jury, and held that it was subject to the judgment and control of the trial court. This discretion is not subject to review upon appeal, unless it appears that there has been abuse of discretion by the trial court. In the case at

bar, we find that there was no abuse of discretion in the action of the trial court in excluding the photographs offered in evidence.

Second. A witness for the defense was asked if he had ever heard the Cassidays make any statements against the life of the defendant. Upon objection being made, the witness was not permitted to answer this question. The defendant excepted to this ruling of the court. The witness was then asked as to threats made by P. W. Cassidy against the defendant. Objection being made, this question was excluded by the court. To this ruling, no exception is contained in the record. The only exception saved was to the ruling of the court upon the first question. This question was objectionable because it was too general and did not identify any person inquired about. It included all the Cassidays, when the record disclosed that there were at least two of that name who testified in this case, and who were in no manner connected with the difficulty. The witness was permitted to answer a question with reference to threats made by Finis Cassiday, the deceased, for the murder of whom defendant was then on trial, but the court held that the witness could not be interrogated as to any statements made by P. W. Cassiday. When a defendant seeks to justify his act in taking the life of the deceased upon the ground of communicated threats and overt acts of the deceased at the time of the homicide, the inquiry as to threats must be confined to those made by the deceased or by some one acting with him.

The philosophy of the law of communicated threats in cases of homicide, when self-defense is relied upon, is that such threats may be considered by the jury for two purposes:

(1) As showing the state of mind of the defendant and the reasonableness of his apprehension or fear of imminent peril of receiving serious bodily injury, or of losing his life at the hands of the deceased at the time of the homicide, based upon some act then done by the deceased which, viewed in the light of such communicated threats, indicated a purpose on the

part of deceased to then carry such threats into execution. In order to make communicated threats admissible for this purpose, it is not necessary to prove that they were in fact made by the deceased. It is sufficient to prove that they were communicated to the defendant as having been made by the deceased under such circumstances, and coming from such a source, as would authorize a reasonable man situated as the defendant then was, to honestly believe that such information was true.

After an able and exhaustive discussion of this question by the Court of Criminal Appeals of Texas, in the case of *Logan v. State,* 17 Tex. App. 50, that court held that in cases of communicated threats it was not necessary to prove that such threats were actually made. The real questions are, Were they communicated to the defendant? and, Were they of such a character, in connection with the acts of the deceased at the time of the homicide, as to create a reasonable apprehension or fear of death or serious bodily harm, in the mind of the defendant, at the hands of the deceased, at the time that the defendant fired the fatal shot? In *Logan's Case* the trial court refused to allow the defendant to prove that such threats had been communicated to him, just before the fatal difficulty, by one John Tosh. After the homicide, and before the trial, Tosh had died. A number of witnesses heard Tosh communicate the threats to Logan. The trial court held that such communicated threats were hearsay, unless the defendant first proved that they were actually made by the deceased. Upon a review of the entire matter and a full discussion of the authorities, the court held that the fact that such threats were communicated to the defendant was original evidence, and that its exclusion was error.

The force of the logic of this position is unanswerable, for two reasons: First. An honest mistake of fact, based upon reasonable grounds, does not make a man a felon. Second. A defendant is always justifiable in acting in his self-defense, or in the defense of his family or property, according to the circumstances as they reasonably appear to him at the time; and if he acts in good faith, and upon reasonable appearances of

danger, the law will hold him guiltless, although it may afterwards turn out that he was mistaken, and there was in fact no danger. As to this issue, the question is not, Were the threats actually made? but it is, Did the defendant have reasonable ground to believe, and did he in good faith believe, that the threats had been made, and that deceased then did some act indicating a purpose to carry such threats into execution? The first ground upon which communicated threats are admissible deals alone with the purpose, the intention, the state of mind, and the apprehensions of the defendant. It has nothing at all to do with the state of mind of the deceased. But suppose that a third person is present at the time of the homicide, and by some word or act then spoken or done gives the defendant reasonable ground to believe that he is acting with the deceased in pursuance of a common design to inflict serious injury upon or to kill the defendant; then the defendant may introduce evidence of threats communicated to him, purporting to have been made by such person, and the admissibility of such communicated threats will rest upon the same ground and be governed by the same principles as are the communicated threats purporting to have been made by the deceased. In the case of *Price v. Territory, ante,* p. —, 98 Pac. 447, this court held:

"When there is the least degree of acting together between two or more parties in the perpetration of an unlawful act, the threats or declarations of one in furtherance of the common design are admissible against all of his associates, although made in the absence of the others."

"But evidence of threats made against the defendant by a person who was not present at the homicide, and is not shown to have been acting with the deceased, is not admissible." (21 Cyc. p. 896, and authorities there cited.)

This is the basis, the extent, and the limit of the rule admitting threats made against the defendant by any other person than the deceased, in cases where threats are admissible.

The second purpose for which communicated threats may be considered by the jury is to aid them in determining as to who was probably the aggressor in the fatal difficulty. This involves

the state of mind and the intentions of the deceased, as well as the defendant, and like uncommunicated threats, before they can be introduced in evidence, to be considered for this purpose, it must be proven that they were actually made by the deceased, or by some one acting with him, under the conditions hereinbefore stated. To make this clear: If it is proven that threats purporting to have been made by the deceased, or some one acting with him, to kill or inflict serious bodily injury upon the defendant, were simply communicated to the defendant, then they are admissible, and can only be considered by the jury for the purpose of determining the reasonableness of the defendant's apprehensions of receiving death or great bodily harm at the hands of the deceased or the person so acting with him, as hereinbefore stated. While, upon the other hand, it must be proven that such threats were actually made by the deceased, or such other person acting with him, against the defendant, before they can be considered by the jury for the purpose of assisting them to ascertain the state of mind of all of the parties engaged in the fatal difficulty and determining who probably began the difficulty. From these premises, it necessarily follows that before any questions can be asked as to threats made by third persons, there must be at least some evidence that such third person was present at the time of the homicide and was acting with the deceased in the commission of an unlawful act against the defendant.

Threats made by persons not so acting with the deceased in pursuance of a common design to injure or kill the defendant are irrelevant to the issue upon such trial, and are not competent as evidence. The record shows that there were two persons named Cassiday who appeared as witnesses in this case, and as to whom it is not claimed that they were present or in the most distant manner acting with the deceased, Finis Cassiday, in the pursuance of a common design to injure the defendant. The question asked and held improper included these persons, and in fact all other persons named Cassiday known to the witness. The witness might as well have been asked if he had ever heard any person make a threat against the defendant. The court

properly sustained the objection to the general question asked. As no exception was taken to the refusal of the court to allow the witness to be questioned as to threats alleged to have been made by P. W. Cassiday, we cannot consider that matter without violating the rule that an exception must be taken to alleged errors of the court in the exclusion or admission of evidence, in order to secure a review of such ruling by this court, unless the error complained of was fundamental. We will state, however, that, even if the action of the court in excluding the question as to threats alleged to have been made by P. W. Cassiday had been excepted to, we are of-the opinion that no error was committed. Our reasons for this conclusion will be given when we come to discuss the instructions given by the court to the jury in another section of this opinion.

Third. The defendant, among other defenses, pleaded in bar to this prosecution former acquittal and also former jeopardy. This plea was based on the fact that the defendant had been tried and acquitted of the murder of P. W. Cassiday. The defendant also, in support of this plea, was permitted to introduce in evidence the entire record, containing all of the testimony in the case against defendant for the murder of P. W. Cassiday. After the evidence for the prosecution in this case had been introduced, the trial court, upon this testimony and the record offered by the defendant, sustained a motion made by the prosecution to strike out the plea of former acquittal and of former jeopardy. To this the defendant duly reserved an exception.

The contention of the defendant is that the plea of former acquittal and former jeopardy should have been submitted to the jury and been determined by them as questions of fact. For a proper application of the legal principles involved in this question, it is necessary that we should make a brief statement of the evidence offered in support of the pleas interposed. P. W. Cassiday and Finis Cassiday were both killed by the defendant in the same difficulty. There were no witnesses to the killing of

these parties, except the defendant. P. W. Cassiday was killed first. In their brief, counsel for the defendant contend that not more than 30 seconds elapsed between the killing of P. W. Cassiday and the killing of Finis Cassiday, and therefore both killings constituted one transaction, and that, as defendant had been acquitted of the murder of P. W. Cassiday, he was entitled to his discharge in the case for the murder of Finis Cassiday, upon the grounds of former acquittal and former jeopardy, and that these pleas should have been submitted to the jury. It is not claimed that the same shot killed both parties. On the contrary, the record conclusively shows that P. W. Cassiday was killed by the first or second shot fired by the defendant, with a shot gun, while Finis Cassiday, according to defendant's own testimony, was killed by a shot fired by the defendant with a pistol some 30 seconds after the shot from the shotgun which killed P. W. Cassiday. Does this state of facts raise the question of former acquittal or former jeopardy? We are constrained to answer this question in the negative. The following authorities are conclusive on this point:

"The issue raised by plea of former acquittal or conviction is for the jury, under proper instructions of the court; but if the plea shows on its face a different offense, or is wholly insufficient, it need not be submitted to the jury." (Abbott's Crim. Brief, p. 141.)

In the case of *Dill v. People,* 19 Colo. 469, 473, 36 Pac. 230, 231 (41 Am. St. Rep. 254), cited by plaintiff in error, the court says in its opinion: "The court did not err in sustaining the demurrer to the plea of *autrefois acquit."*

Also in the case of *State v. Price,* 127 Iowa, 301, 103 N. W. 197, likewise cited by plaintiff in error, the defendant pleaded former acquittal of a charge of rape to a charge of incest, and the prosecution interposed a demurrer to such plea, which was sustained.

"* * * Where the offenses charged in different indictments are so diverse as not to admit of proof that they are the same, the court may decide the issue without submitting it to the jury." (*Epps. v. State,* 38 Tex. Cr. R. 284.)

"If the plea is in form inadequate, or if the offenses in the two indictments cannot be the same, the prosecuting officer demurs." (1 Bishop's Cr. Pro. § 817.)

·"To an indictment charging a shooting with intent to kill, defendant pleaded that he had once been tried and acquitted under a charge of maliciously shooting and wounding a horse, and that the shooting charged in the two prosecutions was one and the same shooting. Held, that a demurrer to his plea was properly sustained." (*State v. Horneman,* 16 Kan. 452.)

"* * * If, in the said affray, a person shoots and kills one person, and by a second act shoots and wounds another, in such case the two results, the killing of the one and the wounding of the other, being different acts of shooting, cannot be said to grow out of the same unlawful act, but out of two distinct acts, and the party shooting is responsible for the two results from the two separate acts, and may be indicted and punished separately for each." (*Gunter v. State,* 111 Ala. 23, 20 South. 632, 56 Am. St. Rep. 17.)

"But where one assaults or kills two persons by separate shots or strokes, although in the same riot or affray, an acquittal or conviction of one assault or homicide is no bar to an indictment for the other, as they are distinct acts." (Cyc. vol. 12, p. 289.)

"A plea of *autrefois acquit,* showing on its face that the offense for which the prisoner was formerly tried is separate and distinct from that for which he stands indicted, is demurrable." The court further said: "The killing was the result of a separate act in each case, committed under degrees of provocation not necessarily the same. In fine, every element to constitute two separate offenses appears on the face of the plea to exist in this case, and therefore the demurrer was properly sustained." (*State v. Evans,* 33 W. Va. 417, 10 S. E. 792.)

"The fact that the act of killing Jesse Hibdon and the act of killing Charles Hibdon were so closely connected in point of time that it was impossible to separate the evidence relating to each of them would not necessarily make the killing of the two one act or one offense. * * * We think there was no error in sustaining the demurrer to the plea." (*Jones v. State,* 61 Ark. 88, 32 S. W. 81.)

In the case of *People v. Ochotski,* 115 Mich. 601, 73 N. W. 889, it is held that, where a defendant was acquitted upon the

charge of assault and battery upon one person, such acquittal was no bar to a subsequent prosecution for an assault with intent to do great bodily harm upon another person, although the assaults were made at the same time and in the same affray. In passing upon the question of former jeopardy in the above case, the court uses the following language:

"But it is contended that the record shows that the respondent in another trial had been acquitted of an assault and battery upon the person of Mr. Heike, growing out of the same transaction as here set out, and therefore that he could not be convicted in the present case. * * * We think the court below was not in error in holding that the acquittal of respondent of the assault upon Mr. Heike would not relieve him in the present proceeding. It was not a trial for the same offense, within the meaning of the Constitution. There is a difference between one violation and one transaction. While it is true that these two offenses grew out of the same affray, yet, no claim is made that the same blows by which Mrs. Heike was injured were the ones which injured Mr. Heike. Bishop, in his work on Criminal Law, lays down the rule that in one transaction a man may commit distinct offenses of assault or homicide upon different persons, and be separately punished for each. Bishop, Crim. Law, § 1061. * * * In the present case it was not the same blow, even, which caused the injury to the two, but different blows. It was the same transaction, but not the same volition."

In the case of *Johnson v. State, ante,* p. —, 97 Pac. 1059, this court held that when the facts stated in a plea of former jeopardy did not constitute a bar to a second prosecution, it was the duty of the trial court to strike the plea from the record.

If there is any evidence in the record which tends in law to support a plea of former acquittal or former conviction or former jeopardy, the issue should be submitted to the jury, and let them pass upon the credibility of the witnesses and the weight of the evidence, under proper instructions from the court as to the law. But where such a conclusion is not a possible, legitimate deduction to be drawn by the jury from the evidence, the court should strike the plea from the record, as was done in this case. Beyond all controversy, the killing of P. W. Cassiday

and of Finis Cassiday were two separate and distinct acts, committed with different weapons.

Fourth. The court instructed the jury as follows:

"If the shooting of Finis Cassiday with the revolver was not justifiable on the grounds of self-defense, and you find from the evidence, beyond a reasonable doubt, that the defendant fired said shot in a heat of passion, and without any design to effect the death of Finis Cassiday, you will then find him guilty of manslaughter in the first degree. Or if he was not justifiable in shooting Finis· Cassiday with the revolver after he had got out of the wagon, and you find from the evidence, beyond a reasonable doubt, that the deceased, Finis Cassiday, had made an attack upon the defendant with a deadly weapon, and that the defendant killed him unnecessarily after such attack had failed, you will then find him guilty ,of manslaughter in the first degree."

The defendant reserved an exception to this instruction. The contention of the defendant is that this instruction is erroneous for two reasons: First, that it required the defendant to prove to the jury that he was not guilty of murder beyond a reasonable doubt, before they could consider the question of manslaughter; second, that it required the defendant to prove to the jury beyond a·reasonable doubt that he was attacked by Finis Cassiday with a deadly weapon before they could consider the question of manslaughter. We admire the force and ingenuity with which these questions are presented in the brief of counsel for the defendant, and the apparent weight of authority which they cite in support of their contention. Taking this isolated paragraph of the instruction, and considering it by itself and without regard to other·portions of the instructions given, then the position of defendant does appear to be supported by reason and authority. But it must be remembered that it is impossible to incorporate in one paragraph all of the law applicable to every issue in a case. The best practice is to divide instructions into paragraphs and then to incorporate in each paragraph as near as possible all of the law applicable to the

issue of fact therein submitted to the jury. This was the method pursued by the able judge who presided at the trial of this case.

The court had previously correctly instructed the jury upon the law of reasonable doubt, not only as applied to the issue of not guilty, but also as applied to the different degrees of the offense charged, these degrees being murder and manslaughter in the first degree. The court most fairly and fully instructed the jury upon the issue of justifiable homicide. In the paragraph now under consideration, the court says: "If the shooting of Finis Cassiday with the revolver was not justifiable on the ground of self-defense, and," etc. As the jury had already been fully instructed on the law of self-defense, and the doctrine of reasonable doubt applicable thereto, it was not necessary to repeat these instructions again. All that a defendant or the state is entitled to is one clear, clean-cut, and affirmative instruction as to each issue presented by the evidence favorable to either side; and that there must not be in the instructions any other statement of law, which is contradictory of such clear, clean-cut, and affirmative instruction. Unnecessary repetitions of correct propositions of law are liable to give them undue prominence in the minds of the jury, and thus improperly affect their verdict. This practice was condemned in the case of *Price v. Territory, ante,* p. —, 98 Pac. 447. That case presents our views upon this question so fully that a further discussion of this matter is not necessary here. The following portion of the first paragraph in the instruction complained of instructs the jury substantially in the language of the second subdivision of the statute defining manslaughter in the first degree, and requires the jury to find the matters of fact therein stated, beyond a reasonable doubt, before they could convict the defendant. So it is seen that so far the defendant has no cause to complain. The first sentence in the second paragraph of the instructions is as follows: "Or if he was not justifiable in shooting Finis Casiday with the revolver after he got out of the wagon," etc.

Instructions must be considered as an entirety, and when so considered, if it appears that the jury have been fully and affirmatively instructed as to the law applicable to each legitimate issue in the case, and there is no conflict between the instructions so given, and neither side can claim that any injustice has been done by the instructions, the judgment of the trial court should and will be sustained. So, the first sentence in the second paragraph of the instruction complained of must be considered in connection with the instruction upon the issue of justifiable homicide, given in another portion of the instructions. As the sentence above quoted does not alter, abridge, or in any manner contradict or conflict with the instructions on the subject of -justifiable homicide, we cannot see how it deprives the defendant of any substantial right. The latter portion of the second paragraph is in the exact language of the third subdivision of the statute on manslaughter in the first degree. Wilson's Rev. & Ann. St. 1903, § 2175. As far as this instruction goes, we hold it as being absolutely correct. In some cases it might be necessary for the court to go further and make plain the fact that, in order to reduce a killing from murder to manslaughter in the first degree, it is not necessary that the unnecessary killing should take place immediately after the attack described in this instruction had failed. In cases, such as the one now under consideration, a necessary element of the offense of murder is that the killing must have been done "without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being."

"A design to effect death, sufficient to constitute murder, may be formed instantly before committing the act by which it is carried into execution." (Wilson's Rev. & Ann. St. 1903, § 2169.)

"Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time." (Wilson's Rev. Ann. St. 1903, § 2170.)

These different sections of our statutes must all be considered together and in harmony with each other. In cases like

the one now before us, the first element of murder is that the killing must be unlawful, and, in addition thereto, that it must have been committed with a "premeditated design to effect the death of the person killed, or some other human being."[1] There must have been premeditation and a formed design to unlawfully take human life. Without either of these elements, there cannot be murder in such cases as this. Section 2170, above quoted, means that although the defendant may be angry, or in a state of voluntary intoxication, this does not reduce his offense to manslaughter, provided he was in such a state of mind as to be capable of premeditation and reflection upon the nature and consequences of his act, and was capable of forming a design to effect death.

We are sustained in these views by the opinion of Judge Burford in the case of *Jewell v. Territory*, 4 Okla. 53, 43 Pac. 1075:

"These statutes are intended to classify all grades of homicide, and to furnish a specific definition for each class. Under subdivision 1, § 2078, St. 1893, the homicidal act must be done with a premeditated design to effect the death of the person killed, or some other person. The premeditated design to effect death is the material element of the offense, and must exist at the time the homicidal act is committed, or there is no murder. It is not sufficient that the fatal shot was fired premeditatedly, for this only implies that the act is done in pursuance of a prior determination. This may be true and yet the shot have been fired for the purpose of maiming or disabling the injured party. Nor is it sufficient to allege that the homicidal act was done with malice aforethought. In its legal sense 'malice' expresses the idea of a willingness to injure another, and when qualified by the word 'aforethought' it implies that the act was done on a previous determination. And one may shoot at another with malice aforethought, intending only to break his pistol arm or disable him, yet with no design to affect the death of the person he desires to injure. Murder, at common law, was committed when a person of sound mind and discretion unlawfully killed any reasonable creature in being, in the peace of the sovereign with malice aforethought, either express or implied. According to this rule, if one feloniously and with malice aforethought wounded

another, from which wound death ensued within a year and a day, it was murder, unless excuse or justification was shown. Under our statute such act would not constitute an element of murder unless perpetrated with a premeditated design to effect the death of the person killed or of some other person, but would be embraced within some one of the lower degrees of homicide."

We commend a careful reading of this entire opinion, as presenting an admirable statement of law applicable to the statutes above referred to. In *Wright v. Territory,* 5 Okla. 78, 47 Pac. 1069, Judge Keaton commended the doctrine announced in Jewell's Case, and sustained a demurrer to the indictment because it failed to allege that the killing was the result of a premeditated design, or intent, to effect the death of the person killed. If it is necessary to allege these elements of murder, it is equally necessary to prove them by competent evidence, as matters of fact, to the satisfaction of the jury beyond a reasonable doubt. The opinion of Judge Bierer, in *Holt v. Territory,* 4 Okla. 76, 43 Pac. 1083, is to the same effect.

In *Smith v. Territory,* 11 Okla. 656, 69 Pac. 803, Judge Hainer said:

"Homicide is murder, as defined by our crimes and punishment act, when perpetrated without authority of law, and with a premeditated design to effect the death of the deceased, or any other human being."

So it is seen that the authorities are unanimous to the effect that under our statutes there can be no such thing as murder in cases like this, unless it was committed in pursuance of a premeditated design to effect the death of some human being. The law is not seeking victims; it does not set up an angelic standard by which men shall be tried; it makes allowance for the weakness and imperfection of human nature. The result is that, if for any reason a defendant who is charged with a felonious homicide can prove that at the time the killing occurred he was in such a state of terror or rage, or was otherwise incapable of premeditation or forming a design to effect the death of some human being, or if the evidence for the state indicates the same state of mind, he cannot be guilty of murder under the statutes above

quoted, unless it be proven by the evidence that his mental condition at the time grew out of his own intentional wrongful and illegal conduct, of such a character as to show that the act of killing was the result of premeditation and formed design. Therefore, if the killing takes place after an attempt has been made by the deceased to commit a crime, and if, as the result of such attempt, the defendant, under the influence of such fear, rage, or terror, takes the life of deceased, at a time when the defendant was incapable therefrom of premeditating or forming a design to effect the death of a human being, his act could not be more than manslaughter, even though it might not immediately follow such an attempt on the part of the deceased. By way of illustration: Suppose that A., upon returning to his home, finds his sister, mother, daughter, or wife murdered, or, worse, dishonored. He learns the details of the crime. This might throw him into a frenzy of passion. The trees, rocks, and all inanimate things would cry, "Shame! Shame! Shame!" The fires of perdition might blaze in his heart; reason might reel and stagger on its throne. If, in this state of mind, he should pursue and overtake the incarnate fiend, in human form, who had done this wrong or who had wrought this deed of infamy, and should slay him, who would say that under this condition of mind he was capable of having formed a premeditated design to unlawfully effect the death of the party slain, and would be guilty of murder? It may be said that this is an extreme illustration. This is granted. But, it must be remembered that it is the extreme case that tests the accuracy of a rule of law. We have presented this view for the purpose of preventing a misunderstanding as to what we believe to be the spirit of the law upon the subject of murder. The statute which states that we shall construe all penal laws liberally and in the furtherance of justice requires us to look more to the spirit than to the letter of the law. This is in harmony with the Divine law, which says, "The letter killeth; 'tis the spirit that giveth life."

While we approve the instruction given in this case, as appli-

cable to the evidence in this record, yet it must not be thought
that the instruction would be approved in all cases as a correct
definition of manslaughter in the first degree.   Human ingen-
uity could not frame an instruction upon the merits of any con-
tested question of fact which would be applicable and sufficient
as to all cases that might arise, where there might be a different
shade of evidence upon practically the same issue.   In this case
there was no evidence of such a state of mind on the part of the
defendant as would incapacitate him from forming an unlawful
premeditated design to effect the death of the deceased,   There
was no evidence which required an instruction on cooling time.
On the contrary, the overwhelming weight of the evidence points
to the fact that the defendant did have such a design, as unerringly
as the needle of the compass points to the North Pole.   The evi-
dence in the case will be presented and discussed in detail when
we come to consider another branch of the case.   The mere fact
that defendant was angry when he fired the fatal shot does not
prevent his act from being murder.   If it did, it would be seldom
indeed when a defendant could be convicted of this offense.   But
few persons are so depraved and so deeply sunken in moral turpi-
tude as to be able to break into the sacred house of life and shed
its precious stream with minds absolutely free from anger, re-
sentment, terror, or some other disturbing passion.   There was,
therefore, no error in the instruction given and excepted to.   It
was applicable to the evidence in the case, and went as far as the
law required, under the facts in this case.

Fifth.   The court instructed the jury as follows:

"No. 3.   A design to effect death, sufficient to constitute
murder, is inferred from the fact of the killing, unless the cir-
cumstances raise a reasonable doubt whether such design existed,
and such design may be formed instantly before committing the
act by which it is carried into execution.   Homicide, committed
with a design to effect death, is none the less murder because
the prepetrator was in a state of anger, passion, or excitement at
the time."

The defendant reserved an exception to this instruction.
It is contended by defendant that it was reversible error for the

court to give this instruction, because the words "passion or excitement" followed after the word "anger," upon the ground that the statute does not use these words, but only uses the word "anger." Defendant's counsel in their brief state:

"The said instruction was exceptionally prejudicial when the words 'passion' or 'excitement' were added to it, for the reason that it precluded the jury from entertaining instruction No. 8 in any form whatsoever."

Instruction No. 8 is as follows:

"No. 8. It is disclosed by the record and the testimony in this case that the defendant at the time and place charged in the indictment, and during the altercation, shot and killed P. W. Cassiday, father of Finis Cassiday. The defendant was indicted for killing P. W. Cassiday, charged with the crime of murder. To this charge he entered a plea of not guilty, and defended said charge upon the grounds that he fired the shot at Finis Cassiday which caused the death of P. W. Cassiday, and that he fired said shot in his own necessary self-defense, and against the assault of Finis Cassiday, with a deadly weapon. Upon the trial of that cause in this court he was by the judgment of the court acquitted. By that judgment the issues necessarily tried and determined are conclusive in this cause, and cannot be again retried. By that judgment it was determined that, in firing the shots from the shotgun which caused the death of P. W. Cassiday, the defendant was justifiable, and that at that time he was not the aggressor, and had reasonable grounds to apprehend a design on the part of Finis Cassiday to take his life or do him some great personal injury, and that he fired the shots from the shotgun in self-defense. These findings in the former case, to the extent set out above, are binding on you in this case, and you are required, in your considerations and deliberations, to treat said findings as facts, and not open to question or inquiry."

We cannot agree with counsel that the use of the words "excitement" or "passion," used in the instruction, in addition to the word "anger," used in the statute, renders the instruction more burdensome to the defendant, or in any manner interfered with any of his substantial rights. Mr. Webster thus defines the meaning of the word "anger":

"A strong passion or emotion of displeasure or antagonism,

excited by a real or supposed injury 'or insult to one's self or others by the intent to do such injury; resentment; wrath; rage; fury; passion; ire; gall; choler; indignation; displeasure; vexation; grudge; spleen. Warmth of constitution often gives. rise to anger; a high sense of honor creates indignation at crime."

⁄ We see from this that anger includes "a strong passion"; and that it also means "resentment; wrath; rage; fury; ire; gall; choler; displeasure; vexation; grudge; and spleen." The same author aalso defines excitement as follows: "Impulsion; agitation. The act of exciting, or the state of having increased action. That which excites or rouses; that which moves, stirs, or induces action; a motive." So it is seen that excitement does not mean near so much as anger. In common use among the people, in the every-day affairs of life, the words "anger" and "passion" are interchangeable, and mean practically the same thing. We must presume that the jury was composed of men of at least ordinary information and intelligence, and we cannot see how they could have been mislead by the instruction given. Counsel do not object to instruction No. 8, except that it was improperly abridged by the use of the word "passion" and "excitement," as used in the preceding instruction. We regard instruction No. 8 as a clear and admirable presentation of the law applicable to the issues therein stated, and as being not only proper but necessary for a determination by the jury of the case then before them. Under this instruction the defendant was absolutely justified in killing P. W. Cassiday, and the jury were prohibited from going behind the verdict in that case, and were required, in mandatory language, to treat all issues in the case as settled in favor of the defendant, except those which arose after the killing of P. W. Cassiday. It is for this reason that any threats made by P. W. Cassiday against the defendant were not admissible in evidence in this case. P. W. Cassiday was dead when the shot was fired which killed Finis Cassiday. His power to harm defendant was gone. He was not then acting with Finis Cassiday in a common design to kill or injure defendant.

The case of *Mealer v. State,* 32 Tex. Cr. R. 102, 22 S. W. 142, is in point as to this question. The evidence in that case disclosed the fact that, at the time the fatal shot was fired, the deceased was engaged in a scuffle with and was being held by a third party. The defendant came up and killed deceased. The defendant sought to justify his action by offering evidence of threats made against him by the deceased. This evidence was excluded by the trial court. Upon appeal the court said:

"There was certainly no error in the refusal of the court to permit appellant to prove threats against himself on the part of the deceased. The defendant was in no possible danger when he shot deceased."

In the case at bar the defendant was in no possible danger from P. W. Cassiday when he fired the shot that killed Finis Cassiday. Therefore defendant could not have a reasonable apprehension or fear of death or great bodily harm from P. W. Cassiday on account of anything that he may have said or done. Instruction No. 8 justified defendant in firing the shot which killed P. W. Cassiday. This entirely eliminated all that P. W. Cassiday had said or done from the case. It justified the defendant unconditionally in all that occurred up to the killing of P. W. Cassiday, and limited the jury, in determining the guilt of the defendant for killing Finis Cassiday, to what took place after P. W. Cassiday was killed. This instruction is the law under the peculiar facts of this case. It was directly beneficial to defendant, and he cannot be heard to complain at the logical consequences of the instruction. (For an application of these consequences in this case, see what is said in the third section of this opinion upon the subject of threats. The writer would have preferred to have all that is said with reference to any subject in one section of the opinion, but in this case it would have been impossible to do this without lengthy repetitions.)

Sixth. The court instructed the jury as follows:

"No. 9. The state in this case presents for your determination the question: Conceding that Morris was justifiable in firing the shots from the shotgun which killed P. W. Cassiday,

and caused Finis Cassiday to fall or crawl from the wagon to the ground, then was he justifiable in drawing his revolver and firing the fatal shot at Finis Cassiday after he was out on the ground? If, after he fired the loads from the shot gun, and Finis Cassiday was out of the wagon, and he had no further reasonable grounds to apprehend that he was in imminent danger of losing his life or suffering some great bodily harm, then he cannot be acquitted on the ground of self-defense, and, if he fired the fatal shot with a premeditated design to take the life of Finis Cassiday, he is guilty of murder."

The defendant reserved an exception to this instruction. The counsel for the defendant in their brief say:

"A plain, unequivocal statement to the jury that Finis Cassiday did fall or crawl from the wagon to the ground as a result of being shot with a shotgun was unwarranted by the evidence, as there is no such evidence."

The defendant himself testified as follows:

"At the second shot they both went out of the wagon. The old man seemed to be knocked out; that is, I thought he was hit somewhere, fatally perhaps. The boy, he went out. They both went out at the same time. The boy partly fell and partly jumped out, and got on the ground and run to the back end of the wagon, and came around just around the wheel. I could see his head and arms, all of the body I could see, and fired from there."

Counsel for the defendant in their brief proceed as follows:

"There was no other testimony, and there could be no other, as the defendant was the only witness present, and yet this instruction absolutely states a condition to be a fact that is not within the lids of this record, and tells the jury that under this said condition it would be murder."

Counsel for defendant have fallen into the error of assuming that, because defendant was the only eyewitness to the kiling, the instructions of the court should have been confined to his testimony alone. The charge excepted to was applicable to the theory of the prosecution, based upon circumstantial evidence, and the physical facts of the case as presented by the body of the deceased and the natural objects surrounding the place where

the body of deceased was found immediately after the commission of the offense. When we come to discuss the testimony of the case, it will be found that there is ample evidence in the record to support this instruction. It is not contended by counsel that the proposition of law contained in the instruction is not correct. The only objection is that the instruction given is not applicable to the testimony of the defendant. We could not sustain this objection without holding that the trial court is. limited in instructing the jury to the testimony of the defendant.

The trial court instructed the jury upon the law of the case applicable to the testimony of the defendant as follows:

"No. 10. If, after Finis Cassiday was out of the wagon, he kept shooting at the defendant, or was making such demonstrations with a revolver as to induce in the mind of the defendant the reasonable apprehension that he was in imminent danger of losing his life or of suffering some great personal injury, and he fired the shot from his revolver which killed Finis Cassiday, believing it necessary for his own safety, then such killing was justifiable, and your verdict should be not guilty."

As no exception was reserved to this instruction, we must assume that it was satisfactory to the defendant. It is therefore not necessary for this court to pass on or discuss it.

Seventh. The defendant requested the court to give the following instruction:

"No. 12. The court instructs the jury that evidence of good character is competent evidence in favor of a party accused, as tending to show that he would not be likely to commit the crime alleged against him, and in this case, if the jury believe from the evidence that prior to the commission of the alleged crime the defendant had borne a good reputation as a quiet, peaceable and law-abiding citizen among his acquaintances and in the neighborhood where he lives, then this is a fact proper to be considered by the jury, with all the other evidence in the case, in determining the question whether the witnesses who have testified to facts tending to criminate him have been mistaken or have testified falsely or truthfully; and if, after a careful consideration of all the evidence in the case, including that bearing upon his previous good character, the jury entertain

any reasonable doubt of the defendant's guilt, then it is your duty to acquit him."

The defendant reserved an exception to the refusal of the court to give this instruction. All of the authorities hold that evidence of the good character of a defendant as a peaceable, law-abiding citizen is relevant and admissible as evidence in his behalf in cases of homicide; but there is a conflict in the authorities as to the duty of the court with reference to instructing the jury on this class of evidence.

In *Heard v. State,* 9 Tex. App. 1, the court said:

"It is also urged that, inasmuch as the defendant had introduced evidence of previous good character, the jury should have been instructed as to the effect of such testimony. The judge, by admitting the evidence to the jury, authorized them to consider it; to have done more would have been to invade the province of the jury, who are by law the exclusive judges of the weight to be given to the testimony. It was beyond the power of the court to tell the jury how much weight they should attach to the evidence of good character."

In *Pharr v. State,* 9 Tex. App. 137, the court said:

"It was not incumbent on the judge to give a special instruction on good character. The law permits one accused of crime to put his previous good character before the jury for their consideration. All the court is required to do is to permit the evidence to go to the jury, to be by them considered in connection with the other testimony in the case, in order to determine from the whole evidence the guilt or innocence of the accused."

Upon the other hand, many courts hold that the better practice is for trial courts to instruct the juries upon the question of character, when this issue is presented by the evidence. An examination of the reported cases will show that it is generally held that when an instruction on the subject of character is given, showing the purposes for which it may be considered by the jury, favorable to the defendant, it should be qualified with the further statement that if, notwithstanding the good character of the defendant, the jury should be convinced of his guilt beyond a reasonable doubt, then this character would not avail

him as a defense, and they should convict him. This is the undoubted law; otherwise Judas did not betray Christ, and Benedict Arnold did not become a traitor to his country. For, prior to the commission of their crimes, these twins in infamy could each have proven a character above reproach by the most credible witnesses. For the qualification which is placed by most courts upon the subject of character, see 2 Thompson on Trials, § 2444, and authorities there cited.

We are of the opinion that it is proper for courts to charge on character, but, in doing this, care should be taken to avoid the objections pointed out by the Texas Court of Criminal Appeals, upon the one hand, and the necessity for the qualifications and limitations required by other courts. Our idea of a correct instruction upon this subject is expressed by the Supreme Court of the United States in the case of *White v. United States,* 164 U. S. 100, 17 Sup. Ct. 39, 41 L. Ed. 365. Justice Peckham there said:

"When the court told the jury it was admitted that the defendant was a man of good character, and that the jury might consider such good character, and give such weight to it as they saw proper, under all the evidence in the case, and that the defendant was entitled to a reasonable doubt, it was sufficient."

We recommend to trial judges in this state to make the remarks of Justice Peckham the basis of their instructions upon character, and then there will be no danger of committing error.

It is argued by some authorities that an instruction upon good character rests upon the same ground and should be as full and mandatory as an instruction upon alibi. The fallacy of this position lies in the fact that an alibi directly controverts the allegation of the commission of the crime by the defendant. If the alibi is sustained, it is demonstrated that the defendant did not and could not have committed the crime. A doubt upon the issue of an alibi is necessarily a doubt as to the guilt of the defendant. Good character may be proven beyond all reason-

able doubt, and yet the defendant may be guilty. An alibi goes directly to the question of guilt, and, if sustained, is a complete defense to an accusation of crime. Good character is not a defense to a crime; at best it is only a fact or circumstance, like any other fact or circumstance not going directly to the question of guilt, from which the jury may or may not draw inferences favorable to the defendant in the light of all the other testimony in the case. Therefore the same necessity for an instruction upon character, and the same fullness, not required as is necessary upon the question of alibi. We therefore hold that if the jury are instructed that it is competent for the defendant to offer evidence of previous good character, and that the jury may consider such evidence of good character, and give it such weight as they see proper, under all the evidence in the case in connection with the law of reasonable doubt, such an instruction is not only all that is necessary, but is as far as the court should go.

The instruction requested and refused in this case went too far in directing the jury as to the purposes for which evidence of good character should be considered by the jury in a manner favorable to the defendant, and, having done this, it is defective in omitting to state the qualifications hereinbefore mentioned favorable to the prosecution. There was no error in the action of the court in refusing to give the special instruction requested. This being true, what was the duty of the court as to giving a correct instruction upon this question? We do not approve the rule heretofore announced by the Supreme Court of Oklahoma Territory, to the effect that if the court refuses to give an instruction requested, upon the ground that it is erroneous, the court is not required to give a correct instruction covering the same subject, if it is presented by the evidence in the case. We think that common fairness requires that when the attention of the court is called to an omission to instruct the jury upon some question of law applicable to the evidence in a case, and a request is made for such an

instruction, the court should give the requested instruction, if it is correct. If the requested instruction is not correct, then the court should either modify it or should refuse it, and give a correct instruction to the jury in its place. In this case the court failed to give the jury any instruction at all upon the question of character. Six witnesses testified to the previous good character of the defendant. This being the condition of the record, what is the duty of this court in the premises? An answer to this question will require a consideration of two legislative enactments of Oklahoma.

Wilson's Rev. & Ann. St. 1903, § 5144, is as follows:

"(5144) § 8. The rule of common law that penal statutes are to be strictly construed, has no application to this chapter. This chapter establishes the law of this territory respecting the subjects to which it relates, and its provisions and all proceedings under it are to be liberally construed, with a view to promote its objects, and in furtherance of justice."

Technical rules and distinctions certainly cannot stand upon higher or stronger ground than statutes. If we are to construe all statutes liberally, and with a view to promote their objects and in furtherance of justice, are we not bound to apply the same rule of construction to technicalities?

Wilson's Rev. & Ann. St. 1903, § 5618, is as follows:

"(5618) § 482. On an appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

This statute has been frequently construed by the Supreme Court of Oklahoma Territory. In *Jones v. Territory,* 5 Okla. 536, 49 Pac. 934, the defendant was prosecuted by information in the county court of Oklahoma county for permitting gaming tables to be set up and used for the purpose of gambling in a house occupied by the defendant. By agreement of the parties this case was certified to the district court of said county for trial. The transcript from the probate court shows that a date was set for the arraignment and receiving the plea of the defendant, but fails to show that the defendant was ever arraigned in said

court, or ever entered a plea of not guilty therein. After being convicted in the district court, the defendant filed a motion for a new trial, and brought the case to the Supreme Court upon the ground that the district court had no jurisdiction to try the cause, for the reason that the defendant had not been arraigned, and that a plea of not guilty had not been entered, in said cause before said cause had been transferred from the probate court. The court said:

"We are of the opinion that under this section (5618) the omission of the probate court to require the defendant to enter a plea of not guilty, before making an order transferring the cause to the district court, could not affect the substantial rights of the defendant, and therefore is not ground for disturbing the judgment."

In a case in the state of Kansas, where the defendant was charged with burglary and grand larceny, and it was conceded that the defendant was not arraigned and did not plead to the information, it was held by the Supreme Court, on appeal, that under a statute identical with ours above quoted, such omission did not affect the substantial rights of the defendant or justify disturbing the judgment. *State v. Cassady,* 12 Kan. 561.

In the case of *Huntley v. Territory,* 7 Okla. 60, 54 Pac. 314, the court said:

"In the absence of any suggestion of fraud or misconduct on the part of the officials whose duty it is, under the statute, to make selections of persons to perform jury service, other than the mere failure to observe the regulations of the statute, and in the absence of any suggestion that a failure to comply with any such statutory regulations could injuriously affect the substantial rights of parties, an appellate court will not reverse the action of a trial court in overruling a challenge to the array based upon a failure to comply with some of the regulations of the statute relating to the selection of juries. *State v. Carney,* 20 Iowa, 82; *Friery v. People,* 54 Barb. 319; *Ferris v. People,* 35 N. Y. 125; 12 Am. & Eng. Enc. Law, 328."

In the case of *Boggs v. U. S.,* 10 Okla. 440. 63 Pac. 973, the court said:

"* * * We are unable to see how the rights of the defendant have been jeopardized or his interests unfavorably affected by the remarks of the court to the jury; and by the Statutes of Oklahoma of 1893, § 5330 (Criminal Procedure), it is made the duty of this court on appeal to give judgment without regard to technical errors or defects, and not to consider exceptions which do not affect the substantial rights of the parties; and as on an examination of the entire record we are unable to see how these remarks of the court could in any way have prejudiced or affected the rights of the defendant, this assignment of error cannot be sustained, as we take the rule to be well established that, when a statute in express and unequivocal terms declares that judgment shall be given without respect to error or objection that does not affect the substantial rights of the parties, it must be made to appear to the court that the substantial rights of the complaining party were unduly prejudiced before the judgment will be reversed."

So it is seen that the common-law rule as to a strict construction of penal laws has been directly repealed by the Legislature, and is not in force in this state, and that on the contrary it is by statute made the express duty of this court to construe all laws liberally and in furtherance of justice, and that this court is positively forbidden to reverse any conviction upon technical errors or defects or exceptions which do not affect the substantial rights of the defendant. It is therefore our duty to examine the entire record before passing upon any technical question or exception, and determine as to whether or not it could have affected any of the substantial rights of the defendant.

In this case the defendant was the only eyewitness to the difficulty which resulted in the death of P. W. Cassiday and Finis Cassiday at his hands. The evidence for the prosecution was therefore entirely circumstantial. We will only be able to give a condensed statement of the material facts. The defendant had rented the farm, upon which the homicide occurred, to P. W. Cassiday. The lease had expired, and Cassiday had removed all of his property from the farm, except two cows, a buggy,

and a box of goods. On the morning of the homicide, P. W. Cassiday, with his two sons, Finis Cassiday and Walter Cassiday, returned to the farm in a wago'n, with high sideboards on it, to get the property yet belonging to him as above described. Walter Cassiday testified that the defendant came to the farm while his father was feeding his horses, that defendant drove his wagon by the side of a haystack; that P. W: Cassiday, Finis Cassiday, and witness were at their wagon eating their dinner. The defendant climbed upon the haystack, and threw down a few bundles of hay, and then came down and got on his (defendant's) wagon and picked up his gun. It was a double-barreled shotgun. Witness was sent by his father to carry a rope to a neighbor. When witness left, Finis Cassiday was sitting on the side of the wagon bed, with his feet hanging outside, and his right side, or back, to defendant, and was fixing a halter. P. W. Cassiday was sitting on the front end of the wagon with a halter in his hands. When witness had gone some distance, he heard two shots fired. They sounded as if they came from the place where he had left the parties above described. They were shotgun shots. Some of the shots passed witness, and knocked up the dirt in a field beyond him. Witness looked back, but, an orchard being between him and the place where the parties were, he could not see them. Witness went on to the place where he had been told to carry the rope, and then came back. He met defendant and a man named Wing. Defendant was in his wagon. Wing was walking behind the wagon. Wing got in the wagon and drove off with defendant. Witness went back to where he had left his father and brother, and found them both dead. P. W. Cassiday was lying in front of the wagon, just under the place where he was sitting when witness left him. Finis Cassiday was lying to the side of the wagon, just outside of the place where he was sitting when witness left. His head was to the west and out from the wagon. Right by his side there was a pile of rocks. There was a hole in the back of the head of Finis Cassiday; brains and blood were oozing out.

Dr. Hazen testified: Examined body of Finis Cassiday. Found a gunshot wound on the left jaw, glancing up and coming out near the nose. One shot about half an inch to the right of the nose, and half an inch below the eye. Did not find where it came out. One shot through the muscle of the arm, halfway between the elbow and shoulder. They were buckshot holes. There was another wound made by a .38 pistol, in the back of the head, which went clear through and lodged under the skin at the bridge of the nose. The effect of the wounds which appeared to have been made by the buckshot would ordinarily be to render a man practically helpless for a few minutes—probably knock him down and stun or paralyze him for a few moments. It would have been impossible for the wounds in the face and arm of the deceased to have been made by shot of the same size as the one that entered the back of his head.

Louis Conner heard shots of the difficulty. First, two shots were heard. They were close together. Afterwards, heard other shots. They were lighter than the first two.

W. W. Bright testified: Reached place of homicide about 2 o'clock. Picked up some shells about 50 feet from Cassiday's wagon, and south and east.

T. P. Alford testified: Saw signs where bullet marks were made on a rock, and an old wagon bolster near a pool of blood where Finis Cassiday's body was found. Also saw where bullets had cut hedge about two feet from ground near there.

Alva Cable testified: Saw the defendant a week before the killing. Defendant said that the Cassidays had been abusing him, and that if they cursed him any more he would give them something they could not carry away. Defendant had two shotguns and a Winchester with him just before the killing.

Mrs. W. P. Cassiday testified that Finis Cassiday was 17 years old at the time of his death. That in January witness saw defendant make an attempt to shoot Finis Cassiday. Witness spoke to defendant, and he desisted. Alfred Wing was with the defendant, and also had a gun. It was proven that the wagons

of defendant and deceased were about 24 feet apart at the time of the tragedy. There were no marks on natural objects of any shots coming from the direction of the wagon of the deceased and toward the wagon of the defendant. All of the marks upon natural objects were of shots coming from defendant's wagon and toward the two Cassidays, and those around Finis Cassiday were all fired toward the ground where Finis Cassiday lay. Venue was proven. Territory rested.

Alfred Wing testified: Heard the shots. Went to the place of killing. Saw defendant. Saw two dead men, and close to Finis Cassiday lay a revolver. Witness picked it up, and put it in his pocket. Four chambers of the pistol were empty. Helped defendant hitch up his team, and left with him.

Defendant, being sworn, testified: Went to farm on day of homicide for some hay. Reached place and found P. W. Cassiday and sons there. Drove up to haystack; threw some bad hay off in a pen; got down and sat on his (defendant's) wagon.

"I moved my gun from the haystack and placed it on the wagon by me. I was sitting there whistling and patting my hands. The Cassidays were in their wagon. Walter Cassiday had gone off. Finis Cassiday said, 'The God damned old beef-eater seems happy.' P. W. Cassiday said, 'Yes,' and the old gentleman then spoke to me, and says, 'We are going away now, and you need not be lying around on us any more, telling that we have tore up your things and broke out your window lights, and so on.' And I hadn't yet spoke to them. And I says, 'Then, if you are going away, I would like for you to put in those window lights that you broke out, anyway.' And he says, I have already done that, I thank you, sir.' 'Well,' I says, 'I beg your pardon; I didn't know it was done; I suppose you have done it today?' And he says, 'No, I done it several days ago.' 'Well,' I says, 'it wasn't done yesterday, for there were five of them broken out; I was there and had a man with me.' And he says, 'If they were broken out, you broke them yourself.' And I told him that I did not, and Finis, at the same time, was talking, both cursing at the same time. Q. Well, just tell the language they said and used. A. And the old man, as he said that, if they

were broken out that I had broken them out, and I told him I
had not, and he says, 'You are a damn liar,' and shook his fist
at me, with a knife in his hand. He was boring at the time he
was talking, in that way (indicating), and he says, 'You have
run over us just as long as you are going to,' and Finis says,
'The damned son of a bitch won't do it any more,' and he raised
then, with his gun in his hand, and just at that time I jumped
to my gun, and he come up with his gun, and the old man says,
'Damn him, shoot him,' as he star⁺ed to raise, and the shooting
commenced. Q. Well, who shot first? A. Finis shot first. Q.
And then what happened? A. Well, he shot, and I got to my
gun that was laying on the hay, just as quick as I could, and
throwed both hammers back, and by that time he had got in
about two shots, and as I brought my gun up I hollered at him
to drop that gun, and fired. Q. Did you fire one or two shots?
A. I fired two shots. Q. What was the result? A. The first
shot, if it took effect, I didn't know it. I never have thought that
it did. At the second shot they both went out of the wagon. The
old man seemed to be knocked out; that is, I thought he was hit
somewhere, fatally perhaps. The boy, he went out. They both
went out the same time. The boy partly fell, and partly jumped
out, and got on the ground and run to the back end of the wagon,
and come around, just around the wheel; I could see his head
and arms, all of the body I could see, and fired from there. Q.
What did you do then? A. I jerked my revolver, and jumped
to a southwest direction, just as fast as I could run in that—not
exactly towards him, but a little to the south, firing with my
revolver. Q. Did you go right on by him, firing as you went?
A. Yes; well, I don't suppose I was firing; I think he fell before
I had got even due south of him. Q. And then where did you
go? A. On up about halfway to the house from there. Q.
How many shots had you fired from the revolver when he fell,
if you know? A. I don't know; I never did know."

Mrs. Eaton testified: "In July, 1905, I heard Finis Cassiday
say to defendant, 'You are a God damned son of a bitch, and I
will get you yet.' "

Miss Jessie Morris, daughter of defendant, testified as did
Mrs. Eaton.

Clay Morris, son of defendant, testified that the pistol
claimed to have been picked up by Wing belonged to Finis

Cassiday, and that he. had heard Finis say that he would get the defendant yet.

Green Hill, son-in-law to defendant, testified that he heard Finis Cassiday say that he would knock the "hell-fired brains out of" defendant, and would kill the old "s. of a b." if it took him all summer.

Witnesses were then introduced in behalf of defendant's good character for peace. It was developed on cross-examination that he had been involved in difficulties with others besides the Cassidays. Defendant rested.

H. Thompson, being introduced by the prosecution in rebuttal, testified that a few hours after the shooting defendant told him, in describing the difficulty, that "they were coming at him with a knife and a gun, and that he got behind the wagon to protect himself, and that when they got in shooting distance he shot at them."

Otis Snigs testified: That the defendant's witness Wing had told him that the Cassidays had about got defendant bluffed out, and that he and defendant loaded up their guns and went out and commenced to break stalks. The Cassiday boys started toward the field, and defendant took his gun and started toward them, and he, Wing, stopped him. This was admitted solely for the purpose of impeaching Wing.

W. T. Feagin testified that about the 1st of February, before the homicide, the defendant's witness, Wing, told him that he, Wing, and defendant were going out to the farm, and if the Cassidays were there they would kill them.

Grant Kimmel testified that the reputation of the defendant for peace was bad.

G. H. Durr, C. A. Brewster, and J. B. Condit testified to the bad character of defendant for peace.

Albert Cassiday testified that the pistol claimed to have been picked up by Wing, near the body of Finis Cassiday, did not belong to Finis.

J. C. Fagan testified that the Saturday after the killing he

heard defendant say that he saw the Cassidays coming around through the gate near the back end of the wagon; that he then got down from the stack, onto the wagon, and picked up his gun; that the Cassidays got into their wagon and commenced to eat their dinner; that he, defendant, let on that he was fixing his gun—the breech of it; that P. W. Cassiday was coming at him with a knife, and that then he shot.

There are hundreds of pages of irrelevant evidence in the record, but the above is a brief statement of the material evidence in the case.

From the testimony of the physician it is evident that when Finis Cassiday was shot, and fell or tumbled, jumped, or crawled from the wagon, he was in a helpless condition. The marks of bullets on the rocks and other natural objects around where Finis lay on the ground show conclusively that the defendant fired upon a prostrate and helpless boy. These evidences of where the bullets struck, mute and inanimate though they are, speak in terms more eloquent and conclusive than human words can express, and confirm the testimony of the physician, and place beyond controversy the fact that defendant did not fire at a fighting man, facing him at the rear of the wagon, as he testified, but that he shot a boy who was already down, and helpless, and shot him in the back of the head at that. It was his own hand that placed these bullet marks upon these rocks and other inanimate objects around the fallen body of Finis Cassiday. The pistol, true to his bidding, sent a bullet crashing through the brain of the deceased, but the same bullet which carried out his purpose rises up and condemns him, and says: "Finis Cassiday was not facing and fighting you, for I entered the spot at which you aimed me, and it was the back of his head; and the other bullets that you fired went where you sent them, all around the body of a boy lying upon the ground."

The previous threats of the defendant, as well as his statements made just after the homicide, cannot be explained except upon the ground that he is guilty of murder. Witness heard

the shots—they came first from a shotgun. The deceased did not have a shotgun. The only shotgun there was in the hands of the defendant. In the face of this record, we are asked to reverse this conviction because the court did not instruct upon the question of character. The evidence of character was by no means clear. It was as much against as in favor of the defendant.

The entire record in this case covers 1,072 pages. We have patiently gone through with every word of it, and given each proposition the best attention of which we are capable. The evidence of character of the defendant, both for and against him, was before the jury. They were correctly instructed that the presumption of innocence and the doctrine of reasonable doubt were applicable to all of the evidence in the case. It would have been better for the court to have given an instruction upon character, embodying the views expressed by the Supreme Court of the United States in *White's Case,* hereinbefore quoted and approved. In some cases, it might be reversible error to fail to give such an instruction; but our statute requires us to construe laws liberally and in the furtherance of justice, and forbids us from reversing a conviction upon a technical error or an exception that does not affect the substantial rights of the defendant. In this case we do not believe that an intelligent and honest jury could be found, who, with a due regard for their oaths, and the testimony and the law, could ever come to any other conclusion than that the defendant was guilty of murder. Under the statute, above quoted, and after a consideration of the entire record, we are constrained to hold that in this case reversible error was not committed by failure of the court to instruct the jury upon the question of character.

Next to honor, human life is the most sacred thing upon this earth. He who intentionally takes this life must be held responsible for his act, and can only be justified upon the ground of necessity, and this necessity must not be the result of his own intentional wrongdoing or willful carelessness. While he is justifiable in acting upon reasonable appearances of danger, yet

he must take care and see that he acts upon such reasonable appearances, and not as the result of his own unlawful and wicked passions. The sooner that desperate and lawless men learn that human life has ceased to be the cheapest thing in Oklahoma, the better it will be for them. They must control their passions or suffer the just penalties of violated law. In order that this improved condition may be made permanent, juries must be careful, firm, and fearless in the discharge of their duties, and courts must uphold their verdicts when it appears from the record that they were rendered upon sufficient evidence and were fairly obtained, and that the defendant was not deprived of any of his substantial rights. These things are necessary for the well-being of society and the protection of the people in the peaceable enjoyment of life, liberty and the pursuits of hapiness. Finding that all of these conditions were met and complied with in this case, there is nothing left for this court to do except to approve and affirm the verdict of the jury and the sentence of the court.

The judgment of the lower court is, therefore, in all things affirmed.

BAKER and DOYLE, JUDGES, concur.

---

## ON MOTION FOR REHEARING.

### Denied April 10, 1909.

PER CURIAM. The third ground relied upon to secure a rehearing is as follows:

"Third. That the judgment of this court in this cause is in direct conflict with the judgment of the court in the case of *Price v. State,* in which the opinion of the court was rendered by Presiding Judge Furman on the 11th day of November, 1908, in which opinion the court declares that a man can scarcely be supposed within 90 seconds from the fall of his victim to have deliberated with himself and formed a premeditated design to effect death, and in the case at bar the appellant had been acquitted of the charge of killing the father of the deceased, a

few seconds before the homicide charged in this cause, and that the appellant was defending himself against the assault of the deceased in this case, and therefore by that finding must have found that he had not effected a premeditated design to kill, prior to the killing of P. W. Cassidy, for which the appellant was acquitted, and the record being clear that there was not to exceed 30 seconds intervening between the killing of P. W. Cassidy and Finis Cassidy, the deceased, for whose killing the appellant was found guilty in the lower court, this court, by the judgment in this cause, found that the appellant might have been guilty of murder in the first degree, with but one-third of the time to deliberate that was held in the case of *Price v. State,* was not sufficient time to effect a premeditated design to commit murder, if the person had been warranted in taking life."

The *Price Case, ante,* p. —, 98 Pac. 447, did not involve the issue as to the sufficiency of time in which the defendant could form a premeditated design to kill the deceased. No such question was presented to or passed upon in that case; the issue was as to whether certain declarations, not of the defendant, but made by the deceased, were admissible in evidence as a part of the *res gestae.* The record in the *Price Case* discloses that the statements offered in evidence were made within one minute after the fatal shot was fired, and while deceased was lying where he had been shot down, and was unable to get up, with the blood flowing from his wound, and while he was suffering from the shock of the wound.

Under these conditions this court did hold that the statements then made by the deceased were spontaneous declarations, and as such were properly admitted in evidence on behalf of the prosecution. In support of this holding, quotations were made from a number of authorities showing the extent to which the courts had gone in admitting declarations as a part of the *res gestae.* Among others, the case of *Mitchem v. State,* 11 Ga. 615, was cited. The language upon which counsel for the defendant relies will be found in this quotation. An examination of this quotation will show that it does not sustain the contention of

counsel for defendant. It was dealing alone with the admission of evidence as *res gestae.*

The opinion quoted from places special emphasis upon the distressed and agitated appearance and manner of the witness, as the basis upon which his testimony was admitted. The rules of law for the admission of evidence and those governing the jury in the consideration of evidence are not always the same, but, even if they were, the quotation in the *Price Case* would not be authority in this case, for the grounds underlying the rule there do not appear in the record of this case.

Just as the spokes of a wheel point to the hub, so the evidence in this case points to deliberate action on the part of the defendant in taking the life of the deceased. It is doubtless true that the defendant was angry, but there is no evidence in the record which indicates that he was laboring under such excitement as would reduce the killing from murder to manslaughter. If there had been such evidence in the record, then it would have been the duty of the court, under the other facts in evidence, to have instructed the jury upon the questions of cooling time. But we fail to find such evidence in the record. The trial court, therefore, did not err in refusing to submit this issue to the jury.

To discuss in detail the other grounds relied upon for a rehearing would be but to reiterate what has been said in the original opinion. Counsel for the defendant are to be commended for the zeal with which they have represented their client. They have raised every question which ingenuity could suggest, and have sustained their propositions with signal ability.

We have gone carefully over the entire case, and have failed to find any ground upon which we would be justified in changing our original opinion. The motion for a rehearing is therefore denied.