## *Ex parte* JEFF D. SMITH.

No. A-72.  Opinion Filed February 4, 1909.

(99 Pac. 893.)

1.  **HABEAS CORPUS—Admission to Bail—Burden of Proof..** On habeas corpus, application for bail in a capital case, after commitment upon examination before a justice of the peace, the burden of proof is on the defendant to show that he is illegally restrained of his liberty.

2.  **BAIL—Right to Release—Reasonable Doubt of Guilt.** If there is reasonable doubt as to the guilt of the defendant of a capital offense, he is entitled to bail.

3.  **.SAME—Right to Release—Sickness.** On application to the Criminal Court of Appeals for bail by writ of **habeas corpus** after commitment for a capital offense by a justice of the peace, when it is made clearly to appear, by the testimony of competent, reputable physicians who have examined the physical condition of the prisoner at the time the application is made, that there is strong ground for the opinion that continued confinement would cause the disease from which the prisoner is then suffering to terminate fatally, he should be released on bail,

(Syllabus by the Court.)

Original application by Jeff D. Smith for a writ of *habeas corpus* to be admitted to bail.  Prisoner admitted to bail.

On the 15th day of November, 1908, Jeff D. Smith (hereinafter called defendant) shot and killed John Tabner in Wetumka, in Hughes county. The defendant waived a preliminary examination, and was committed to jail without bail, to await trial upon the charge of murder. Since then the defendant applied to Hon. John Caruthers, judge of the district court, for a writ of *habeas corpus,* in order that he might be admitted to bail on the said

charge of murder. Bail was refused upon this application. On the 15th of January, 1908, defendant applied to this court for a writ of *habeas corpus* in order that he might obtain bail pending his final trial on said charge of murder. This application for bail was based upon two grounds: First, that the proof was not evident, nor the presumption great, that the defendant was guilty of murder, and that therefore under our Constitution he was entitled to bail pending his final trial; second, that defendant is afflicted with tuberculosis and that his condition is such that further confinement in jail will greatly endanger his life.

The writ of *habeas corpus* was issued as prayed for. The return of the sheriff was in keeping with the above statement of facts. With the permission of the court, and by agreement of counsel, the case was submitted upon affidavits filed by the respective parties. These affidavits, omitting irrelevant statements, are as follows:

"Comes now E. M. Lumley who states that he is of the age of 29 years. His post office address is Keystone, Okla., and is a saddle and harness maker. That on the 15th day of November, 1908, he was a resident of Wetumka, Okla., and was present on the streets at the time of the difficulty between Reed, Tabner and Jeff and Ben Smith. Affiant states that the trouble came up by a fight between Reed and Jeff Smith. Reed had the best of the fight, and was on top; Smith being on the ground. Ben Smith came up, and was in a drunken condition. Tabner then came up, and soon thereafter he (Tabner) and Ben Smith exchanged shots, each shooting more than once. Tabner ran in the direction of Lumley's hardware store after he had shot Ben Smith, Ben Smith following him several feet, and then returned to where Jeff and Reed were fighting, when he fell dead. As soon as Reed let Jeff Smith get up, some one remarked in words, to the effect 'Let him have that gun, his brother has been murdered.' Jeff Smith secured a pistol in some way—I do not know just how— and immediately followed after Tabner. By this time I had gone to the hardware store, and when I got there, there was present in the store my brother, T. M. Lumley, and C. B. Williams and Tabner. Jeff Smith came in at the front door. C. B. Williams and T. M. Lumley immediately left the store in apparent excitement,

and so did I. I was the last one to leave the store of us three. The last I saw of Tabner and Smith in the store was that Smith had a pistol in his hand and down by his side. Tabner had his pistol drawn directly on Smith, and as a matter of fact I ran to keep from seeing Tabner kill Smith, for it looked like that would be the inevitable result. I went out to where my brother and C. B. Williams were standing on the outside, and about that time a shot was fired in the store—one shot only. I made the remark "There goes Jeff Smith,' or something like that. No one of us saw the shooting, and could not have seen it from where we were. Smith was not shot, but Tabner was shot. Smith acted like a crazy man; appeared very much excited over the killing of his brother, and the time between the time he was let up by Reed at the street fight and the time he did the shooting was of very short duration. He followed up immediately, and the difficulty occurred in the hardware store after the street fight where Ben Smith had been shot."

"Martin L. Nichols being duly sworn upon oath says that he is town clerk of the town of Wetumka. 'I was in the town of Wetumka on the forenoon of November 15, 1908. Ben Smith's little boy appeared in Main street south of us. The boy was on horseback, and had a little white dog in his arms, or at least on the horse with him. Monroe Reed said, "I will go up and get my dog." He started south and the boy started back south on Main street. Reed called to the boy to stop, and when the boy failed to stop, the constable, Monroe Reed, called upon others to stop the boy. When Reed reached about the middle of the block south of the town hall block, he mounted a horse and rode after the boy. Both turned west in Broadway at the corner of the First National Bank. About that time John Tabner, the night watchman, came to the town hall and said that he had been awakened by Kurley, the Brock Hotel proprietor. I told him that there was trouble upon the street; that Monroe and the Smiths were having trouble, and I could then see people running west towards Broadway. John Tabner started south towards where we could see the people gathering. John Tabner went south in the alley west of the First National Bank, and John C. Laport and myself, with others, went to corner of Main street and Broadway. I saw Jeff Smith and Monroe fighting. Smith was down on the ground, and Monroe Reed was on top holding him down. They were about 35 feet west of the west line of Main street. They were in Broadway,

and about six feet from the sidewalk on the north side of the street. When I came in sight of the two men, Jeff and Monroe Reed, Ben Smith was walking around with a six-shooter in his left hand. He said to the crowd, 'Stand back or I'll shoot you.' He repeated that threat several times. I tried to get him to stop. He said to me, 'Stand back, or God damn you, I'll kill you.' John Tabner appeared about that time, and said to Ben Smith: 'Give up that gun, and quit.' Ben Smith then fired at Monroe Reed. The shot seemed to go a little to the right of his head. He then quickly turned, and fired directly at John Tabner. Tabner instantly drew his gun, and fired at Ben Smith twice in rapid succession. John then took his gun down, and in a moment said: 'Monroe, my gun won't work. Let us run.' John Tabner then started in about a southeasterly direction, with Ben Smith following after him, and went about 80 feet. When Ben Smith was running after Tabner, he also appeared to be trying to work his gun, but it failed to go off. He stopped, and started back and commenced staggering, and fell on his face in the street. It was in Broadway west of the band stand. When he fell, he still held the six-shooter in his left hand. I went to him, and wrenched the gun out of his hand, stuck it in my side pocket, and started in a northeasterly direction. When about 20 feet east of the corner of the First National Bank on the cross-walk which crosses Main street on the north line of Broadway, Tom Sipes and Jeff D. Smith came behind me and Sipes seized my right wrist, and jerked it out of my pocket. The gun was in my right hand, and my hand was in right coat pocket. Both demanded that I give up the gun, Jeff D. Smith saying, 'John Tabner killed my brother, and I want to shoot the son of a bitch.' I said, 'Don't do that.' Tom Sipes said, 'Let him have the gun. Tabner has killed his brother, and the son of a bitch ought to be shot.' Jeff Smith gave the gun a wrench out of my hand, and throwing it in my face, pointing at me, said: 'If you don't tell me where John Tabner is, I'll kill you.' He caught me by the collar of my coat, and told me that I had to go with him. He did that twice, but I told him that I did not know where John Tabner was. He compelled me to go with him across Broadway to the south side of the street at the corner of Meadors Bros. & Busey's store. About that time some parties came out of Lumley's hardware store, which is about 100 feet farther south on the east side of Main street. Smith said, 'The rascal is there.' He let go of me, and ran

south and turned in at the door of T. M. Lumley's hardware store. I stood at the corner of Meadors Bros. & Busey's store, and in a short time I heard the report of a gun in the direction of Lumley's store, and soon thereafter John Tabner came out of the door of Lumley's hardware store crawling upon his hands and knees. Jeff D. Smith was right behind him, with a six-shooter in each hand. Smith was compelling John Tabner to crawl along on the sidewalk. I saw Jeff D. Smith hit John Tabner on the head with a six-shooter several times, and also saw Jeff D. Smith kick John Tabner with his foot. When they passed where I was, John Tabner was calling for help. Jeff Smith said: 'Oh yes, I'll help you. I'll take you back where my brother is, and then I'll fix you. After they had passed me, I went into Lumley's store and did not see any more of the trouble for 10 or 15 minutes. When I came out, Jeff Smith was running up and down in Main street north of the band stand, and had a six-shooter in his hand. I turned east in Broadway. I am in no way related or connected with any of the parties concerned in the killing. Tabner was our night watchman, and fired at Ben Smith only after Ben Smith had shot at him."

"Monroe Reed, being duly sworn, says upon oath: I am 50 years old, and live in the town of Wetumka. I saw my dog tied to the horn of a saddle on Jeff Smith's horse. The horse was standing across the sidewalk just east of the front door of the livery barn, and a negro was holding the horse. The dog was sitting in the seat of the saddle, but was tied short to the horn. I untied the rope, and loosened the dog. I took him down and placed him on the ground. I started east on the south side of Broadway and the dog followed along with me. I turned north on Main street, and walked along the west side of Main street to the town hall. I met John C. Laport, J. L. Nichols, and Rev. T. J. Townsend. I sat down at the south side of the town hall, and was looking south. I saw Jeff Smith and another man riding around in the neighborhood of the band stand. The two men were riding one horse. Shortly afterwards I saw one of Ben Smith's boys riding Jeff Smith's horse, and having my dog in front of him on the saddle. He rode about to within 50 feet of the north end of the First National Bank block, when he turned back, and I called to him to give up the dog. He rode faster, and I called to some man to stop the boy with the dog. When I came near to the center or at the middle of it, I unhitched a horse that was

tied on the west side of the street, mounted, and rode after the boy. He turned west at the First National Bank, and I overtook him a short distance west of the corner. I asked him for the dog, and he refused, and turned his horse around heading back east towards Main street. I also turned my horse, or the one I was riding and again overtook him, reached over, and took the dog. About that time Jeff Smith came up, and told me to give him the dog. I said, 'No, Jeff, you can't get him.' He replied 'God damn you, I will.' I said, 'Jeff, I am going to have that dog.' He said: 'God damn you, you won't do nothing.' He dismounted, and wrenched the dog away from me. I then dismounted, and he struck at me, and I think I warded off his blow. I then hit him and knocked him down. I then jumped on top of him, and held him down. Almost immediately after I knocked Jeff Smith down, and held him down, Ben Smith appeared with a Colt's revolver in his hand. He pointed the gun at me, and I said, 'Ben, you can't afford to shoot me that way' and you had better not do it.' He turned back, or rather faced around towards the crowd, and, swinging the gun in his left hand, said to the bystanders, 'Stand back, or God damn you, I'll shoot you.' The crowd pushed back somewhat, and he again turned towards me. I was sitting on Jeff and holding him down. He came close to me, pointed the gun at me, and I got off Jeff. I got up, and so did Jeff. Jeff came at me again to fight. I said to the crowd, 'Won't some of you men show me a fair fight, and disarm that man?' I again had to clinch with Jeff, and I threw him down on the ground. Again Ben Smith came and pointed the gun at me. I said, 'Ben, are you going to shoot me?' He says, 'No, I wouldn't harm a hair on you. You are fighting my brother.' He again turned towards the crowd, and drove it back. He again came over me with the gun in his hand. About that time John Tabner, the night watchman, said 'Drop that gun.' I had not seen him, but I knew his voice. Then Ben Smith fired one shot, and Tabner wheeled around where I could see him, and he reached for his gun. Then Ben Smith fired at Tabner. I think Tabner struck Ben Smith's gun and warded off the shot. Immediately Tabner fired at Ben Smith twice. Tabner's gun seemed to hang, and Smith could not handle his gun. Both stood for a moment, and each appeared to be trying to work his gun. Then John Tabner looked down at me and said, 'Monroe, let us run. My gun won't work.' He (John Tabner) then ran across the street to the

corner of the American National Bank. Ben ran after him to near the corner of the bank. He threw his arm out as if he was trying to shoot, but he could not work the gun. Ben stopped, turned around, and stood, hesitating an instant, and started back towards me but acted like a drunk man· and came about halfway across the street, or perhaps a little more than halfway. Again he stopped, and fell. Jeff Smith was fighting at me, but I was holding him down. I saw Mr. Nichols get the gun from Ben Smith's hand. I saw Ben Smith carried by some men to the sidewalk, and laid upon the sidewalk apparently dead. I held Jeff· a little longer and then let him up, and I went upstairs into the Central Telephone office to get a gun. I saw them no more that day."

"My name is Monroe Collis, and I live in Wetumka. I was in Wetumka on the forenoon of November 15, 1908. I was at the brick hotel about 10 o'clock or after. I came out on the east front or porch of the hotel. About that time Ben Smith fired off a six-shooter in the driveway, in the front end of the livery barn. He swore an oath, and said he was a night rider from Kentucky, and told us people over there to 'get back you sons of bitches. I guess you want to be witnesses.' He repeated that remark two or three times. I stood still. Roy Gammill came over· and I saw him (Roy) go in the hotel and talk to Kurley. Kurley came out of the hotel, and went uptown. He went east on the north side of Broadway. I stood on that porch for some time. While Roy Gammill was in the hotel, the two Smiths, Jeff and Ben, were in front of the barn. They had a dog, and put the dog on the pony. or horse. They put the dog upon the pony behind a little boy, and then threw a blanket at the dog, and the horse would buck and kick up a little, they were having apparent fun. I finally left the hotel, and came on east on the north side of West Broadway, and turned north on Main street· and went down to the town hall, and was in company with M. L. Nichols, John C. Laport and Monroe Reed, and I saw the same boy that I had seen in front of the livery barn with the dog on the horse, and he was then turned south in Main street. Reed had started south on Main street, and had not gone far till he said, 'Hold on there, boy, I want that dog.' or words to that effect. About that time John Tabner came to where Nichols, Laport and I were sitting. John said. 'Good morning, gentlemen. What is the news?' Some one of them were telling about blood being upon

the sidewalk, and while we were talking about the blood on the sidewalk, we saw people begin to gather around towards the S. E. Corner of the First National Bank. Laport spoke to John Tabner about there probably being a fight up there, and John started south, and came south through the alley west of the First National Bank building block. I came south with Laport and Mr. Nichols. They were ahead of me. When I reached the S. E. corner of the First National Bank, I saw Jeff D. Smith and Monroe Reed on the ground. Reed was apparently holding Smith. Jeff D. Smith. on the ground. They were not fighting much. A crowd was gathering around. Ben Smith was there with a six-shooter in his hand—in his left hand. He was presenting it to the boys, and telling them to stand back. He said to Roy Chowing, 'God damn you. I'll shoot you.' I then left, and went to Crank's drug store. I then turned, and came back. I ran down, and ran back. When I got back to the corner of the bank, I saw Ben Smith shoot in the ground, it seemed to me, and then appeared to me that he shot at about John Tabner's shoulders. Instantly John Tabner fired a couple of shots directly at Ben Smith. They were close together. I was about 30 or 40 feet away. There was quite a crowd. But I could see plainly that Ben Smith fired right at Tabner. It seemed to be right in his face. John Tabner ducked his head, and I thought he was killed, but I saw him fire twice at Ben Smith in very rapid succession, and I at once turned away, I walked down the sidewalk on the west side of Main street in front of the First National Bank. Then I saw John Tabner cross over to the American National Bank. He was walking fast and seemed to be feeling his gun. I did not notice Ben Smith at all. I turned and walked back, and saw men carrying Ben Smith to the sidewalk on the south side of the First National Bank. I again turned north, and walked to about the post office. Before I turned back that time, I heard a shot in South Main street, and turned and saw smoke. It was down towards Rive's store or near there. I then went north to the post office. I stayed around there a few minutes, and heard cries in south of me, and I again looked south. I saw John Tabner walking, and limping across Main street, and saw Jeff D. Smith behind him cursing and making considerable noise, but I could not understand what he was saying. I was still standing at the post office, when I heard a shot or two around behind the First National Bank. I soon saw John Tabner coming east around from Parker's store. He dropped his overcoat

and called to somebody to give him a horse. There was a little boy on a horse near Jarrett's livery barn. But the boy spurred the horse, and rode away. Tabner crossed Main street, and passed east on the north side of Crank's drug store. I did not go to the northwest corner of the drug store. I saw Jeff Smith come in sight from the north side of Parker's store. He was walking fast, and I heard him say to them to get out of the way up there. He must have seen Tabner, as Tabner had not had time enough to get around the corner of the drug store until Jeff D. Smith was also on the same street.. I almost saw them both at the the same time. One was hardly out of my sight till the other came into sight. Jeff came to near the northwest corner of Crank's drug store, when he cut across towards the post office, which is the third door from the north end of the block. He tried to go through the net wire poultry yard, but failed, and turned back on the sidewalk, and went into the printing office, but found that fastened. He then went on south towards the Texas House. I turned and went back north towards home. I lived on the north end of Main street just south of the Frisco railroad tracks. I saw nothing more."

"Mrs. Mollie Bell, being duly sworn, upon oath, says: My name is Mollie Bell. I am a married woman, and have grown children. I live in Wetumka, Hughes county, Okla. I keep a hotel in Wetumka. It is called the Texas Hotel, and I have a number of regular boarders. I was at home in Wetumka, my hotel on the forenoon of November 15, 1908, when Mr. Kurley, of the Brock Hotel, came to my house to find John Tabner. John Tabner was the night watchman of the town of Wetumka. He was up nights, and slept in the daytime. He had a room at my hotel, and ate at my hotel. Mr. Kurley went to John Tabner's room, and after he came back from John's room, John Tabner came into my kitchen, where I was, and told me that he had been called upon to go out and settle some trouble. I gave him a cup of warm coffee before he left the kitchen. I sat in on the cook table, I asked him not to go, that he had done his duty at night, and that the other officers should do their duty during the daytime. I was getting the dinner ready to place upon the table, and saw the boys, boarders, who were in the front room, go to the front door, for a time stand and look, and then they rushed out. I then went into the main room to see what was the trouble. I went to the front door. It faces west. I could see two men

fighting at the southeast corner of the First National Bank. I could distinguish one as Jeff D. Smith, and one as Monroe Reed. I did not want to see the fight, and went away from the door. The door is nearly all glass. The front of the building in which I keep hotel was built for, and once occupied as, a store. It is a regular glass front of a store. I went to the room of my daughter-in-law, as she was frightened at all of the men having left the house. In a few minutes I again came to the front of the building, and looked and saw the men shooting. I called to my son, fearing that he might be hit accidentally. I saw Ben Smith waving his gun above his head, and saying, 'Stand back boys.' I saw him shoot at John Tabner. I saw John Tabner raise his gun, and his gun fired. I do not know how many shots were fired. I saw John Tabner run towards the hardware store. I saw Ben Smith follow him, and stop, and turn around and stagger, and walk and fall forward on his face. I saw Mr. M. L. Nichols as he was coming away from the prostrate man on the ground. I mean away from Ben Smith. When Ben Smith fell, or an instant after, I again went back into the house, but soon returned to the front door, which I opened, and heard the cries of John Tabner, calling for help. He said, among other things, 'Oh God, haven't I a friend in town?' I went to the sidewalk, and saw Jeff Smith beating John Tabner over the head. I asked who it was, and my son said it was John Tabner. John Tabner was on his hands and knees, and when John started to get up, Smith knocked him down with his gun. Smith cursed him and said, 'Get up and go where my brother is, and God damn you, You must die like a dog.' It was almost a continual beating of John Tabner from where I first saw Smith and Tabner until they turned west on Broadway at the corner of the First National Bank. In a few minutes John Tabner came into my kitchen, through the back kitchen door. It had not been more than 30 minutes since I had given John the cup of coffee. He went upstairs. I saw him going up. Just about the time John Tabner was at the head of the stairs, Jeff D. Smith came to the back dining room door. I was about midway of the hall, and my son was between me and the rear dining room door. Jeff D. Smith pushed his gun against the door, and said: 'I am going in. One word is enough for you, I am going in.' Jeff D. Smith at once proceeded to go into each room. There are five rooms on the south side of

2 Cr.—3

the hall. I tried to prevent him from going into the room next to the street, as my daughter-in-law was in that room, and she was sick. He took hold of my left arm, and threw his gun against me pointing towards me, and said: 'You have the·God damn son of a bitch hid. Old lady, don't you lie to me. I don't want to have to kill you, but I am going to have that God damn son of a bitch that you have got hid here. If you lie to me, there'll be a hereafter to this.' My son-in-law·came in, and said to me let him go in and see, and then he will be convinced. Smith then went into the room where my daughter-in-law and daughter were. He came out and said: 'He is who I want, and I'm going to hunt till I find him.' I then opened the front door, leading out on the Main street, and I repeatedly asked him to give me his gun. He refused. I told him that he was scaring my daughters to death. He said· 'It makes no difference. I am going to have the son of a bitch that murdered my brother.' I kept his attention directed towards the front of the house, and, keeping the door open for some time, he then went out on the Main street. Smith walked up and down the street for some minutes, cursing and swearing, and when he met any man, he invariably pointed his gun at them till he passed. After he went to the street, it was five minutes or more before he quit walking, cursing, and swearing. John Tabner lived at my house after that till he died. He died at 1 o'clock on Wednesday morning, the second Wednesday after he was shot on a Sunday. He often told me the position he was in when Jeff D. Smith shot him in the back in Lumley's hardware store. My hotel is about 100 feet north of the crossing of Broadway and Main streets, and is one of the east side of the street."

"Ed Rigsby, being duly sworn, says: My name is Ed Rigsby. I am 31 years of age, and now live near Prague, but in Okfuskee county, Okla. I did live near Wetumka, and was in the town of Wetumka on the forenoon of November 15, 1908, when Ben Smith was killed. I was standing in front of the drug store of J. R. Dutton on the west side of Main street, when I saw people running towards the corner of the First National Bank, and I came south on Main street. When I reached the First National Bank corner I saw Jeff D. Smith and Monroe Reed trying to fight. They were a little west of the west line of Main street, and were out in the street. Ben Smith was in front of me, and as he reached the corner, he pulled out his gun, and then Roy Chowins and

George Wilkerson tried to hold him, or to take his gun from him. They had a hold of him. He quickly broke away from them, and went out to the place where Jeff and Monroe Reed were on the ground. Reed was still on top, and Jeff below. Ben Smith patted Reed on the head, and said, 'Whip hell out of him.' He was still holding the gun in his hand, and told the crowd to stand back. One of the Chowins boys, I think it was Roy—he was a single one—went to Ben Smith, and Ben put the gun against him, and said, 'Stand back; don't come up here or, God damn you, I'll kill you.' Chowins threw up both hands, and went back and said, 'Ben don't do that.' When John Tabner came up from the west he approached Ben, and said, 'You must not do this.' Ben replied, 'God damn you, don't come up here, or I'll shoot you.' Tabner walked up and Ben shoved him back with his right hand; held the gun in his left hand. Tabner came up again, and Ben said, 'Stand back, or God damn you, Ill kill you.' Tabner started towards Ben, and Ben shot, and quickly shot again. Ben was right in front of Tabner, and not more than 4 feet away. He shot right towards Tabner, and not more than 4 feet away. He shot right towards Tabner. The crowd made a surge, and I could not see well. Ben Smith appeared to me to have a hold of Tabner's coat with his right hand, and fired with his left, right at Tabner. Then I heard two more shots. There were no more shots fired in that place after Tabner got loose from Ben. Then Tabner ran off in the direction of the American National Bank, and Ben Smith after him. Ben tried to shoot and failed, but when he stopped, he took his gun in both hands, and again failed to make it go off. He turned then, and started back to where Jeff and Monroe Reed were still fighting. He staggered and came to about the middle of the street when he fell, face down. I saw M. L. Nichols coming away from Ben Smith. Ben was still on the ground. I saw the gun in Nichols' hand at some time after he had taken it, shortly afterwards having a struggle with Nichols somewhere near the S. E. corner of the First National Bank. I was still standing near the S. E. corner of the First National Bank, when I heard a shot fired in the direction of Lumley's hardware store. It was in that direction. I saw the beating of Tabner by Smith from the hardware store to the bank. I heard Tabner says, 'Boys, help me, I am shot to death.' I heard Smith warn the crowd not to come up. He had a pistol in each hand."

"Melville C. Wells, being duly sworn, upon oath says: My name is Melville C. Wells and I live in the town of Wetumka, Hughes county, Okla. I am a married man, and the head of a family. I have lived in Wetumka six years. I own a meat market and the telephone system of the town. I am 60 years of age. I spend most of my time in my store or meat market. My son-in-law works in the store with me. My son Dick Wells manages the telephone office. We live on the north side of the railroad tracks. I was in Wetumka on the forenoon of November 15, 1908, and was at my store when I heard Ben Smith say, in a loud voice: 'Stand back, boys, stand back.' My store is 250 feet south of the American National Bank, on the west side of Main street in Wetumka. The door was open, and I was sitting on a box near the counter in the front end of the store. I heard the man say, 'Stand back boys. Let them fight.' I got up at once, and hastened to the north end of the block, at the corner of the American National Bank. When I reached the bank corner, I saw Ben Smith waving his pistol above his head. He held the pistol in his left hand. Ben Smith said, 'Let them fight fair. I'll kill the first man that interferes.' I crossed the street called Broadway, to the corner of the First National Bank. I saw John Tabner approach Ben Smith, and although Tabner spoke to Ben Smith, I could not understand what he said. Ben Smith faced Tabner and fired. He was standing between Tabner and myself, and I did not see Tabner shoot, but I think I heard four shots. Tabner turned and ran across the street, Broadway, 'till he struck the sidewalk, when he turned and went south to about the Owl drug store. I followed him, and met him about at the Owl drug store. I asked John Tabner if he was shot, and he answered 'No.' I again asked him if he was not hurt, and he answered again 'No.' He said his gun had caught and would not work. I took the gun in my hand and examined it. I cocked the pistol and aimed it at the ground and pulled the trigger and it fired. I handed it back to him, and he crossed the street to the hardware store of T. M. Lumley. I followed him across the street, and went into the hardware store with him. I stood here, and saw him reload his gun. T. M. Lumley and his brother, Ephriam Lumley, and C. B. Williams were also in the store. John Tabner and Eph Lumley went to the rear of the Lumley store. I came out on the sidewalk. The Lumley hardware store is on the east side of Main street. I started north on the sidewalk, and went about 30 feet

when I met Jeff D. Smith. Jeff had a gun in his hand. He was in a run, and went into the Lumley hardware store. In a few minutes I heard the report of a pistol. I also heard Tabner calling for help at about the same time, I heard the shot, or shortly thereafter. The shot sounded from the hardware store. There was only one shot. I had stopped and looked around when Jeff Smith had passed me. I was standing when I heard the shot, and when I first heard John Tabner calling for help. In a moment I saw Smith kick Tabner out of the door of the hardware store. Jeff Smith had two pistols, one in each hand. John Tabner was on his hands and knees, and Jeff Smith had two pistols, one in each hand. John Tabner was on his hands and knees, and Jeff Smith would strike him with one gun and then with the other. The blows were aimed at Tabner's head. I crossed the street, and went to my own store. I saw no more of the trouble. I was about 30 feet from the door of T. M. Lumley's store on the sidewalk when I heard the pistol shot in the hardware store of T. M. Lumley. I was standing still, and cannot be mistaken as to the location of that shot. The door was open, and I was standing, and was expecting to hear of trouble in that store. I was unarmed. John Tabner was our night watchman, and a deputy town marshal. After Jeff D. Smith had passed me on the sidewalk, and after he had gone into the store, T. M. Lumley and C. B. Williams came out of that store to the sidewalk and approached me, and were standing near me when the pistol was fired in the store. There was but one fired in the store. I was not over 30 feet from the door of the hardware store when that shot was fired. I was north of the store door."

"My name is John C. Laport, and I am 40 years of age. I live in the town of Wetumka, in the county of Hughes, in the state of Oklahoma. I am a justice of the peace of the township of Wetumka. Reed looked south in Main street, and saw a little boy on horseback with a little white dog in his arms. Constable Reed spoke up, and said, 'I will go and get my dog.' Reed started south on Main street, and the boy turned his horse in that direction also. Reed called upon the boy to stop, but the boy kept on going, and when Reed reached about the middle of the block, or at about Forman's drug store he mounted a horse and rode after the boy, who turned west on Broadway at the corner of the First National Bank. About that time John Tabner, the night watchman of the town, came to the place where we were. I told

Tabner that I believed there was trouble between Jeff Smith and Monroe Reed, and that he had better go and see. I also suggested that he had better go south through the alley west of the First National Bank, and he did so. I walked south on Main street to the S. E. corner of the First National Bank, and saw Jeff D. Smith and Monroe Reed fighting. They were on the ground, and Reed was on top holding Jeff Smith down. Ben Smith was walking around with a six-shooter in his left hand, and commanding the crowd to 'stand back.' Soon John Tabner appeared, and, walking around to where Ben Smith was said something, but I did not understand the remark. Almost immediately after John Tabner spoke to Ben Smith, he (Ben Smith) fired his pistol. I could not tell in what direction the pistol was pointing. But the night watchman then drew his pistol, and fired at Ben Smith twice in rapid succession. Then he stooped over a little and said something, but I could not hear what he said. Tabner then started on a run in a southeasterly direction toward the corner of the American National Bank, and Ben Smith followed after him till Smith reached the sidewalk. Then Ben Smith turned and came back, and about halfway across the street towards where Monroe Reed and Jeff D. Smith were still fighting on the ground, and fell face downwards. Mr. M. L. Nichols then went to Ben Smith, and wrenched the gun from Ben Smith's left hand. I saw Mr. Nichols go in a northeasterly direction. When Ben Smith fell, several of the bystanders said, 'That man is killed,' and a crowd gathered around him. I kept watch of Mr. Nichols, who was crossing Main street east of the First National Bank. I saw Jeff D. Smith and Tom Sipes go to Mr. M. L. Nichols but thought that Mr. Sipes was helping Nichols, and I went back to the town hall. In a few minutes I saw John Tabner hurrying east on the street north of Broadway and parallel to Broadway. He passed north of Crank's drug store, and turned south in the alley east of Main street. Soon afterwards I saw Jeff D. Smith walking rapidly, and running some, in Main street, going into several places, among others Hank's restaurant, or the door beside that restaurant, Jeff remaining in the street at least half an hour. He had a gun in his hand."

The following affidavits upon the question of the health of the defendant were introduced:

"J. D. Scott, being duly sworn, upon oath states that he re-

sides at Holdenville, Okla.; that he is 36 years of age; that he is a regular practicing physician, having been engaged in the regular practice for 12 years; that he knows Jeff Smith, who is confined in the county jail of Hughes county, Okla.; that on the 13th day of January, 1909, he examined Jeff Smith to ascertain whether or not he had tuberculosis, and after a careful examination he found Jeff Smith had a well-developed case of tuberculosis; that his pulse was $121\frac{1}{2}$ degrees of fever; that he is of the opinion that unless he is released from his present confinement he will not live long; and that confinement is greatly to his detriment. Affiant further states that he found Jeff Smith in a weakened condition, with one lung almost consumed by tuberculosis and that unless he is released and given plenty of fresh air, he will not live many days. Affiant further states that he is not related to Jeff Smith, and this opinion is given as a practicing physician, based upon an examination of the said Jeff Smith, about 9 o'clock on the morning of the 13th of January, 1909."

"W. D. Atkins, being duly sworn, upon oath states that he resides at Lamar, Hughes county, Okla.; that he is 33 years of age; that he is an acting practicing physician, and has been engaged in the general practice for 13 years; that he is president of the county board of health; that he knows Jeff Smith and Ira Smith; that Ira Smith has tuberculosis, and is now confined in his bed and almost at the point of death; that Jeff Smith is confined in the county jail of Hughes county, Okla., and upon recent examination made by affiant the said Jeff Smith has tuberculosis, same being hereditary, and confinement in the county jail of Hughes county will greatly endanger the life of the said Jeff Smith who is now bleeding of the lungs, and spitting up blood, which bleeding of the lungs is caused from a well-developed case of tuberculosis. Affiant further states that if Jeff Smith is not released, he is of the opinion that death will soon follow. Affiant further states that he is not related to Jeff Smith, and this opinion is given as a physician, based upon the facts, after a careful examination."

"James K. King, being duly sworn, upon oath states that he is sheriff of Hughes county, Okla.; that he has in his custody Jeff Smith, charged with murder; that he has observed Smith daily since his confinement; that he frequently spits up blood; has a severe cough; has not appetite, and to all appearances he is losing his health rapidly."

"D. A. Eoff, being duly sworn, upon oath states that he is jailer for the common jail of Hughes county, Okla.; that he has been such jailer ever since Jeff Smith, the defendant, has been confined, charged with the crime of murder; that the said Jeff Smith has a cough which is very severe of a morning, and he has noticed the defendant Jeff Smith, spitting up mouthfuls of blood; that he is not a physician and does not know where the blood comes from, but the defendant complains that his breast is sore, and that the blood comes off his lungs."

"Floyd E. Waterfield, being duly sworn, on his oath states that he is 38 years of age; that his post office address is Holdenville, Okla.; that he is a physician in regular practice in the city of Holdenville, Okla.; that he has been a regular practicing physician for 14 years; that on January 22, 1909, Jeff Smith, who is confined in the county jail of Hughes county, Okla., on a charge of murder, was brought to the office of the affiant herein, on the request of attorneys for prosecution; that the affiant herein began an examination of said Jeff Smith with a view of ascertaining his condition as to health; that soon after the examination began, and before anything definite could be ascertained, the said Jeff Smith stated that he desired the examination cease until he conferred with his attorneys; that he stated that he had consumption, and had had it about 2 years, or longer; that there was present at the time, Dr. H. A. Howell, a regular practicing physician, and a reputable and respected physician and surgeon of this city. The affiant states further that he is in nowise connected, directly or indirectly, in either the prosecution or defense in the case against Jeff Smith."

"J. B. Dyer, being duly sworn, upon oath says: My name is J. B. Dyer, and I live in Wetumka, Hughes county, Okla. I have lived in Wetumka about 3 years—more than 3 years. I have known Jeff Smith. I met Jeff Smith shortly after coming to Wetumka. Jeff Smith and myself have been friends ever since we met. I am a married man, and the head of a family. I am 69 years of age. I live in the town of Wetumka. I served throughout the Civil War, and at the close of the war was a captain of volunteers. I own some property in Wetumka. I saw Jeff Smith on the streets of Wetumka on the Sunday of the shooting, when Ben Smith was killed. I also met him (Jeff Smith) the day after the shooting and shook hands with him. I do not remember of seeing him again until the 5th day of January, 1909. I was in

Holdenville to pay my taxes. I went to the door of the jail, afterwards, and spoke to Jeff Smith. We shook hands, and he appeared to be very well, as well as I have ever seen him. He did not complain to me of being sick. He raised his vest, and said to me: 'See here. Cap., the pants I wore when I came here won't meet on me by an inch.' It might have been more than an inch that he said, and it might be that he said 'two inches.' We talked about five minutes, and I left him. There was nothing said about bond by either of us. I had no idea that he was trying to get bail on account of bad health, and when I heard that report I told men in Wetumka of what I had seen, and what he had said to me. I am not in any manner related or connected with the late John Tabner. I make this statement simply in the interest of truth and justice."

*Crump, Rogers & Harris* and *J. L. Skinner,* for applicant.

*Charles Moore,* Asst. Atty. Gen., and *James A. Long,* for the State.

No briefs reached the reporter.

FURMAN, PRESIDING JUDGE. (after stating the facts as above). Section 8 of the Bill of Rights of our Constitution is as follows (Bunn's Ed. § 17) :

"All persons shall be bailable, by sufficient sureties, except for capital offenses when the proof of guilt is evident, or the presumption thereof is great."

This clause of the Constitution has been construed by the Supreme Court of this state in the case of *In re Thomas,* 20 Okla. 167, 93 Pac. 983. Mr. Justice Kane there said :

"We believe that, with the burden of proof on the petitioners, if, after hearing the whole evidence introduced on the application for bail, it is insufficient to generate in the mind of the court a reasonable doubt whether the accused committed the act charged, and in doing so they were guilty of a capital offense, bail should be refused."

The rule as to the burden of proof in such cases was followed by this court in *Re Watson,* 1 Okla. Cr. 595, 99 Pac. 161. Upon hearing the argument of counsel when this case was submitted to the court, all of the affidavits filed were not read at

the time, and we were inclined to the opinion that bail should be allowed upon the facts of the killing; but, upon a careful consideration of these affidavits, we have decided not to allow bail upon this branch of the case. We do not say that upon the final trial of this case a state of facts may not be developed which may raise the issue of manslaughter. We are simply passing upon the case as now presented to us. To prove that such a condition of affairs existed as might bring about a state of mind on the part of defendant which might raise the issue of manslaughter is one thing—to prove that this state of mind did exist is another thing. To reduce an unlawful killing from murder to manslaughter two things must concur: First, conditions must be shown to exist which would be calculated to produce in the mind of a person of ordinary prudence and self-control, such rage, fury, or terror as would render the mind of the defendant incapable of forming a premeditated design to effect the death of the person slain, or of any other human being; second, it must also be shown that the defendant was, in fact, at the time of the homicide laboring under such rage, fury, or terror. Neither of these conditions, without the other, would be sufficient to reduce an unlawful killing to manslaughter. If the jury should be satisfied beyond a reasonable doubt that the defendant was guilty of an unlawful killing, but entertained a reasonable doubt as to whether his offense was murder or manslaughter, it would be their duty to give the defendant the benefit of such doubt, and convict him of that grade of offense of which they had no doubt. Our views as to the distinction between murder and manslaughter are fully expressed in *Morris v. Territory,* 1 Okla. Cr. 617, 99 Pac. 760, and need not be repeated here. We will not discuss the evidence, lest it might influence the final trial. We are only passing upon the sufficiency of the evidence submitted to us.

On the second ground relied upon we are of opinion that bail should be granted. Dr. J. D. Scott states in his affidavit that he has examined the defendant, and found him in a greatly weakened condition, with one lung almost consumed by tuberculosis,

and that unless he is given plenty of fresh air he will not live many days. Dr. W. D. Atkins states in his affidavit the condition of the defendant about as it is stated by Dr. Scott, and further adds that unless defendant is released from jail, his death will soon occur. James King, the sheriff of Hughes county, confirms the statement of the physician as to the condition of defendant, and adds that "he is losing his health rapidly." D. A. Eoff, the jailer of Hughes county, also files an affidavit as to the bad health of defendant. These affidavits are clear, direct, and well-nigh conclusive. It is generally known throughout the eastern part of the state that the county jails are inadequate for the care of the sick and the afflicted, and this court is authorized to take judicial notice of that fact. As to the power and duty of the courts to grant bail pending final trial upon the ground of sickness of a defendant see *In re Thomas,* 20 Okla. 167, 93 Pac. 982, and *In re Watson,* 1 Okla. Cr. 595, 99 Pac. 161.

The county attorney of Hughes county has recommended that the defendant be granted bail in this case in the sum of $10,000, but, in view of the facts presented to us, we do not think this amount sufficient. It is therefore ordered that the defendant be allowed bail in the sum of $15,000, to be approved by the clerk of the district court of Hughes county, with good and sufficient sureties, as the law directs.

BAKER and DOYLE, JUDGES, concur.